3 A.3d 421

Alan TYLER, et al.

v.

CITY OF COLLEGE PARK, et al.

No. 126, Sept. Term, 2009.

Court of Appeals of Maryland.

Aug. 25, 2010.

478

Timothy F. Maloney (Joseph M. Creed of Joseph, Greenwald & Laake, P.A. of Greenbelt, MD), on brief, for appellants.

Linda S. Woolf (K. Nichole Nesbitt and Derek M. Stikeleather of Goodell, DeVries, Leech & Dann, LLP of Baltimore, MD), on brief, for appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

Appellants, four owners of affected rental properties in the City of College Park[1] and one student renter, contend that

---

1. The City of College Park is home to the flagship campus of the University of Maryland, a major public university.

Appellees, the Mayor and Council of the City of College Park,[2] enacted a novel (and apparently unprecedented) rent control program for the explicit purposes of discouraging in the City the rental property market in so-called "single-family" neighborhoods and nudging renters to nearby apartment buildings or future apartment complexes, rather than for the primary purpose of protecting tenants from exorbitant rental rates, the traditional rationale underlying rent control legislation. According to Appellants, the City's rent control program will impair the rental property market for the most affordable housing in the City, namely, rentals of rooms and common areas in single-family detached homes, while encouraging the rise of rents in the sector of the rental market already containing the most expensive housing, medium-rise and high-rise apartments, by exempting those properties from the rent control restrictions. On these grounds, Appellants charge principally that the City's rent control program violates Article 24 of the Maryland Declaration of Rights and the anti-discrimination provisions of the State of Maryland and Prince George's County Fair Housing Acts, and constitutes impermissible de facto zoning by a legislative body without zoning power. For reasons we shall explain, we disagree with Appellants' contentions and affirm the grant by the Circuit Court for Prince George's County of summary judgment to the City on Appellants' claims, thereby upholding the validity of the City's unique rent control program.

## FACTS

Two years prior to the enactment of the City's rent control program in 2005, following discussions about using rent stabilization as a response to public concerns of rising rental costs, neighborhood deterioration, and inflated purchase prices for homes due to the increasing number of rental conversions in the City's traditional "single-family" neighborhoods, the City

---

2. Throughout this Opinion, we shall refer sometimes to Appellants and the municipality collectively as "the City," where contextually it is appropriate to do so.

Council drafted a comprehensive Housing Plan. The Housing Plan included a "neighborhood revitalization" component, which stated that "[t]he quality of life in the city can and should be raised...." In order to remedy this perceived "quality of life" problem, the Housing Plan recommended enactment of a rent control program in the City to be used as a "regulatory tool" to impair the profitability of rental conversions in so-called "single-family" neighborhoods. Specifically, the Housing Plan noted:

Rent stabilization is one tool that can be used to ensure that rental units are available/maintained as affordable housing units. Rent stabilization limits what landlords can charge tenants. The effect on single-family homes converted to rentals will be to make it less profitable to make these conversions.

\* \* \*

If legally feasible, rent stabilization could be considered as a regulatory tool to deter future conversions in residential areas which are primarily owner occupied. Assuming this, geographic boundaries can be drawn to include the areas that need to be protected.

In April 2004, City Councilmember Robert Catlin, a retired economist, submitted a proposed ordinance which sought to implement the rent control concept outlined in the Housing Plan. Catlin's proposal provided that a rent ceiling would apply to all single-family, duplex, triplex, and quadraplex rental properties, but that larger multi-unit apartment buildings would be exempt. In Catlin's view, such a plan would decrease the number of "single-family" properties that are rental units while encouraging construction of new apartment buildings which, in turn, would improve the balance between rental supply and demand in the City. Upon Catlin's request for a review of the legality of the proposal, the City Attorney, in a memorandum, expressed concern over the validity of the proposed rent control program, stating:

[W]e embarked upon drafting a rent stabilization ordinance in accordance with the parameters requested by Councilman

484

Catlin. Some of the provisions requested, such as exempt-
ing apartment buildings, establishing a rent ceiling based
upon an amount certain, and using the protection of the
City's stock of single family owner occupied housing as a
purpose for enacting such an ordinance, have not been
tested in Court. Accordingly, we cannot guarantee that the
City would prevail in a challenge of the proposed ordinance.
We have attempted to address all of the concerns raised by
the Courts that have addressed rent control issues; howev-
er, some of the elements of the requested legislation are
novel.

Despite the concerns of the City Attorney, Catlin pressed
forward with the rent control proposal.

Prior to voting on Councilmember Catlin's proposed rent
control ordinance, the City commissioned Anirban Basu, a
policy analyst from the Sage Policy Group (a private consul-
tant), to produce a report (hereinafter "the Sage Report")
addressing the question of whether the City's stated policy
objectives could be addressed reasonably through a rent stabi-
lization program. The report, released in April 2005 and
entitled "There is a Rational Basis for Rent Stabilization in
College Park, Maryland," analyzed the available literature on
rent control and City-specific data concerning the rental mar-
ket. The report confirmed the City's beliefs regarding the
pattern of declining home ownership, increasing rental conver-
sions, diminished housing affordability, and code violations in
the City. The Sage Report concluded that rent stabilization "is
likely to be conducive" not just to stabilizing rents for affected
properties, but also to enhancing home ownership and de-
creasing violations of the City code by reducing future rental
conversions of single-family homes.

One month after the Sage Report was released, on 24 May
2005, the Mayor and City Council adopted, by a 7–1 vote,
Ordinance 05–2–02 (hereinafter "the Ordinance"), which, ac-
cording to its title, established a rent stabilization program in
the City, set forth the fees and penalties associated with the
program, and created a Rent Stabilization Board to administer

the program.[3] The Ordinance's Preamble set forth the basic legislative facts as found by the City Council and explicated the general rationale underlying the City's adoption of the Ordinance, providing in pertinent part: [4]

WHEREAS, on June 10, 2003, the Mayor and City Council of the City of College Park approved the City of College Park Housing Plan (the "Housing Plan"); and

WHEREAS, according to the Housing Plan, the City of College Park had a total of 6,245 housing units in 2000 (not including 8,420 beds in University of Maryland dormitories, another 1,740 beds in public/private partnership housing on University of Maryland owned land, and 1,386 beds in fraternity and sorority houses); and

WHEREAS, 4,204 of those units, or 67.3%, are single-family detached homes, while 152 units or 2.4% are single-family attached houses (townhouses), 268 units, or 4.2%, are located within structures containing 2–4 units, and 1,613 units, or 25.8%, are within structures containing 5 units or more; and

WHEREAS, the 2000 United States Census reported an owner occupancy rate of 57.2% for College Park, a decline of 9.8% from 1980; and

WHEREAS, in 2000, renters occupied 2,582 units or 42.8% of the City's conventional housing units; and

WHEREAS, in 2000, the City's median monthly rent was $806 compared to Prince George's County's rate of $737; and

WHEREAS, in 1999, 40.6% of the renters in the City of College Park paid more than 35% of their household income for rent. This percentage is 17.7% more than surrounding municipalities; and

---

**3.** The City enacted amendments to the Ordinance on 9 August 2005 and 12 June 2007. The provisions of the Ordinance, as recounted in this Opinion, reflect these amendments, unless noted otherwise.

**4.** The language of the Preamble appears only in the initial version of the Ordinance.

WHEREAS, studies indicate that the percentage of renter occupied housing units have increased since the Housing Plan was prepared and that there has been a corresponding decrease in the percentage of owner-occupied housing; and

WHEREAS, with higher rents being charged in the City of College Park than in Prince George's County for comparable housing units, renters in the City are faced with spending an ever-increasing percentage of their household income for rent; and

WHEREAS, the Mayor and City Council finds that the cost of rental housing in the City is abnormally high; and

WHEREAS, the Mayor and City Council further finds that there is a substantial and ever increasing shortage of decent rental housing accommodations, especially for families, households of low and moderate income and those on fixed incomes, in the City; and

WHEREAS, with such a large percentage of rental properties in the City, the City loses income taxes and motor vehicle taxes not paid by a large portion of the renters; accordingly, the owner occupied properties subsidize rental properties; and

WHEREAS, rental properties artificially inflate the value of property in the City, thereby adversely affecting the owner occupied properties and leading to unstable neighborhoods; and

WHEREAS, the current rental market in the City poses a threat to the public health, safety and welfare of the citizens of the City of College Park; and

WHEREAS, the Mayor and City Council deem the protection of the City's stock of owner occupied housing to be a legitimate public purpose; and

WHEREAS, the Mayor and City Council deem it to be in the best interest of the City to adopt a rent stabilization program in order to ensure the availability and maintenance of affordable housing in the City, to protect the standard of living of all City residents, and finally to strengthen and stabilize the City's neighborhoods.

The first substantive section of the Ordinance outlines the composition and requirements of the Rent Stabilization Board (hereinafter "the Board"), whose primary powers are to administer the rent stabilization program, determine and set rents "at fair and equitable levels," require registration of all rental units subject to the Ordinance, and make adjustments to the rent ceiling in accordance with the provisions of the Ordinance. *See* City of College Park Code (1991 & Supp. 50) (hereinafter "City Code"), §§ 15–39 to 15–54.

The Ordinance's second substantive section outlines the City's rent stabilization program itself. At the outset of this portion of the Ordinance, § 127–1, entitled "Purpose," details the intended goals of the program:

A. City of College Park residents should have decent housing in pleasant neighborhoods at prices they can afford. The City of College Park Housing Plan, approved June 10, 2003, establishes the following policies, among others:

1. To encourage the University of Maryland and the private sector to provide suitable housing to meet the needs of undergraduate and graduate students on or near campus.

2. To encourage the availability of housing for households of all income levels, and to preserve, maintain and improve existing housing.

3. To strengthen College Park neighborhoods by reducing the number of single-family homes that are rental properties.

4. To encourage private reinvestment by homeowners consistent with a neighborhood's character.

B. The College Park City Council finds that there is a pattern of steadily rising rents, and a shortage of affordable well-maintained housing, and that the rate of deterioration of the existing housing stock in the City has increased in recent years. The College Park City Council further finds that this situation poses a threat to the public health, safety and welfare of the citizens of the City of College Park.

C. The purposes of this chapter are to regulate residential rent increases in the City of College Park and to protect

tenants from unwarranted rent increases, in order to help maintain the diversity of the community. This chapter is designed to preserve the public peace, health, safety and welfare and to advance the housing policies of the City. City Code § 127–1.

The core provision of the Ordinance, detailing the newly-imposed rent ceiling in the City, is found in § 127–4, entitled "Establishment of rent ceiling," which provides in pertinent part:

A. At the time that a dwelling unit [5] becomes subject to the registration requirements of Section 127–5 of this chapter, no landlord shall charge a monthly rent for any controlled rental unit in an amount more than:

1. In the case of a single-family dwelling unit, the greater of (a) the HUD level [6] or (b)(i) until July 1, 2007, 1% of the property's assessed value for property taxes, (ii) from July 1, 2007 until June 30, 2008, .8% of the property's assessed value for property taxes, (iii) from July 1, 2008 until June 30, 2009, .7% of the property's assessed value for property taxes, or (iv) after July 1, 2009, .6% of the property's assessed value for property taxes.

2. In the case of a duplex, [7] triplex [8] and quadraplex, [9] the combined monthly rent for all rental units located

---

5. The Ordinance defines "dwelling unit" as "any room or group of rooms located within a structure and forming a single habitable unit, with facilities which are used or intended to be used for living, sleeping, cooking and eating purposes." City Code § 127–3.F.

6. The Ordinance defines "HUD level" as "the fair market rent level established annually by the United States Department of Housing and Urban Development for the Washington Metropolitan Statistical Area for a four-bedroom unit." City Code § 127–3.H.

7. The Ordinance defines "duplex" as "a structure comprising a single real property tax account, containing two single-family dwelling units, with each unit having its own separate exterior entrance(s) and designed for use as an individual dwelling unit." City Code § 127–3.E.

8. The Ordinance defines "triplex" as "a structure comprising a single real property tax account, containing three single-family dwelling units,

therein shall not exceed the greater of (a) the HUD level or (b)(i) until July 1, 2007, 1.5% of the property's assessed value from property taxes, (ii) from July 1, 2007 until June 30, 2008, 1.2% of the property's assessed value for property taxes, (iii) from July 1, 2008 until June 30, 2009, 1.1% of the property's assessed value for property taxes, or (iv) after July 1, 2009, 1% of the property's assessed value for property taxes.

3. Notwithstanding the provisions of subsection (A)(1) and (A)(2) of this section, maximum rents of controlled rental units may be adjusted further in accordance with § 127-7 to establish rent levels consistent with principles of fair rents based on costs of operating each controlled rental unit, while assuring the owner a fair net operating income.

B. Beginning in January 2007, and every three years thereafter, the City Council may reconsider the criteria for the establishment of rent ceilings, based, among other factors, on the triennial reassessments of properties in the City.

City Code § 127-4. Section 127-6, entitled "Rent ceiling after initial registration year," addresses the amount of the rent ceiling in the following rental years, providing in pertinent part:

A. Effective on July 1, each year after the initial registration of a rental unit subject to this Chapter 127, the maximum monthly rent a landlord may charge for such unit shall not exceed the greater of:

1. The HUD level then in effect;

2. (a) In the case of a single-family dwelling unit, (i) until July 1, 2007, 1% of the property's assessed value for

---

with each unit having its own separate exterior entrance(s) and designed for use as an individual dwelling unit." City Code § 127-3.Q.

**9.** The Ordinance defines "quadraplex" as "a structure comprising a single real property tax account, containing four single-family dwelling units, with each unit having its own separate exterior entrance(s) and designed for use as an individual dwelling unit." City Code § 127-3.K.

property taxes, (ii) from July 1, 2007 until June 30, 2008, .8% of the property's assessed value for property taxes, (iii) from July 1, 2008 until June 30, 2009, .7% of the property's assessed value for property taxes, or (iv) after July 1, 2009, .6% of the property's assessed value for property taxes; or

(b) in the case of a duplex, triplex or quadraplex, collectively for all rental units located therein (i) until July 1, 2007, 1.5% of the property's assessed value for property taxes, (ii) from July 1, 2007 until June 30, 2008, 1.2% of the property's assessed value for property taxes, (iii) from July 1, 2008 until June 30, 2009, 1.1% of the property's assessed value for property taxes, or (iv) after July 1, 2009, 1% of the property's assessed value for property taxes.

3. If the rent for the preceding year was determined by the City to fall at or below the rent ceiling or the property was not subject to the rent ceiling as a consequence of having a valid lease agreement in effect on or before June 14, 2005, the rent for the preceding year plus one hundred percent (100%) of the increase in the overall CPI–U,[10] applied to the rent charged in for the preceding year.

\* . \* \*

C. Notwithstanding the provisions of sections (a) and (b) of this section, maximum rents of controlled rental units may be adjusted further in accordance with § 127–7 to establish rent levels consistent with principles of fair rents based on costs of operating each controlled rental unit, while assuring the owner a fair net operating income.

City Code § 127–6.

The Ordinance continues by providing a procedure where landlords may petition the Board for a different individual

---

**10.** The Ordinance defines "CPI–U" as "the U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index, All Urban Consumers, Washington, DC–MD–VA, using the figures released by the Department in February of each year, generated upon January month-end data." City Code § 127–3.D.

rent ceiling, based on factors such as increases in property taxes, increases in maintenance or operating expenses, the cost of capital improvements made to the property, and the landlord's rate of return. Specifically, § 127–7, entitled "Individual adjustments of rent ceilings," provides in pertinent part:

A. Petitions. Upon receipt of a petition by a landlord and/or tenant, the rent ceiling of individual controlled rental units may be adjusted upward or downward in accordance with the procedures set forth elsewhere in this section. . . .

\* \* \*

B. Hearing procedure. The Board shall enact rules governing hearings regarding petitions for individual adjustments of rent ceilings which shall include the following:

\* \* \*

(7) Quantum of proof and notice of decision. No individual rent ceiling adjustment shall be granted unless supported by the preponderance of the evidence submitted at the hearing. . . .

\* \* \*

(9) Appeal.

(a) Any person aggrieved by a decision of the Board may appeal the decision to the Mayor and City Council. An appeal to the Mayor and City Council shall be filed no later than thirty days from the notice of the decision of the Board.

\* \* \*

C. Considerations by Board.

(1) In making individual adjustments of the rent ceiling, the Board shall consider the purposes of this chapter and shall specifically consider all relevant factors, including (but not limited to):

(a) Increases or decreases in property taxes;

(b) Unavoidable increases or any decreases in maintenance and operating expenses;

\* \* \*

(h) The landlord's rate of return on investment. In determining such return, all relevant factors, including but not limited to the following shall be considered: the landlord's actual cash down payment, method of financing the property, and any federal or state tax benefits accruing to landlord as a result of ownership of the property;

\* \* \*

(2) It is the intent of this Chapter that individual upward adjustments in the rent ceilings on units be made only when the landlord demonstrates that such adjustments are necessary to provide the landlord with a fair return on investment.

\* \* \*

I. No provision of this Chapter shall be applied so as to prohibit the Board from granting an individual rent adjustment that is demonstrated necessary by the landlord to provide the landlord with a fair return on investment.

City Code § 127–7. In addition to the provisions for individual adjustments of the rent ceiling on petition of a landlord, § 127–8 of the Ordinance, entitled "Hardship exemption," allows for temporary exemptions from the rent ceiling in certain circumstances, stating in pertinent part:

A. The Board may grant a temporary exemption from the provisions of this Chapter to an owner of not more than one property subject to the registration requirements of this Chapter if it determines that said owner would otherwise experience extreme financial hardship because of mortgage or financial obligations related to the property incurred before the effective date of this Act.

City Code § 127–8.A.

Where a landlord or tenant believes that he or she has been impacted unfairly by a decision of the Board, he or she may

pursue judicial review. Section 127–12 of the Ordinance, entitled "Judicial review," states:

A landlord or tenant aggrieved by any decision of the Board or any action or decision of the Mayor and Council where a right to appeal the decision of the Board to the Mayor and Council is provided herein may, within 30 days of the decision seek judicial review in a Court of appropriate jurisdiction. Appeal of any decision shall be made in accordance with the Maryland Rules.

City Code § 127–12.

Of utmost importance to the present litigation, the Ordinance provides, in § 127–2, entitled "Applicability," that the rent ceiling established by the Ordinance does not apply to a considerable number of excepted property types, including, *inter alia,* hotels, university housing, and apartment buildings, stating:

This chapter shall apply to all real property that is being rented or is available for rent for residential use, in whole or in part, except for the following:

A. Property owned by the State of Maryland or the federal government.

B. Rental units that are rented primarily to transient guests for use or occupancy for fewer than fourteen consecutive days in establishments such as hotels, motels, inns, tourist homes, and rooming and boarding houses; however, the payment of rent every fourteen days or fewer shall not by itself exempt any unit from coverage by this chapter.

C. Rental units in any college or school dormitory operated exclusively for educational purposes. For purposes of this ordinance, the term "dormitory" shall include a fraternity and sorority house, as defined in section 125–1 of this Code, regardless of the number of sleeping accommodations therein.

D. Nursing home or charitable home for the aged, not organized or operated for profit.

E. Apartment buildings as defined in § 127–3.

City Code § 127–2. The Ordinance defines "apartment build-ing" as "a building containing three or more dwelling units each of which contains one or more rooms suitable for occu-pancy as a residence and that contains a kitchen and bathroom facilities. It does not include a single-family residence, or a duplex, triplex, quadraplex as defined in § 127–3, regardless of the number of dwelling units contained in the structure, or a fraternity or sorority house." City Code § 127–3.A. As such, the rent control program established by the Ordinance distinguishes on the one hand between single-family resi-dences, duplexes, triplexes, and quadraplexes, all of which are subject to the rent ceiling, and on the other hand apartment buildings, which are exempt from the rent ceiling.

On 27 October 2006, Appellants brought an action in the Circuit Court for Prince George's County challenging the validity of the City's Ordinance,[11] alleging, *inter alia*, that: (1) the Ordinance violates facially their rights to equal protection and due process under Article 24 of the Maryland Declaration of Rights because the provisions of the Ordinance are not related rationally to a valid government purpose; (2) the Ordinance violates facially the State and County Fair Housing Acts by discriminating based upon age, marital status, familial status, and/or occupation; (3) the Ordinance constitutes imper-missible de facto zoning by the City; and, (4) the Ordinance's rent ceiling is unconstitutionally confiscatory on its face. On 25 September 2008, the City moved for summary judgment on Appellants' claims.[12]

At the hearing on the City's motion for summary judgment, held on 16 October 2008, Appellants highlighted, largely from materials adduced as the result of discovery, factual aver-

---

**11.** Appellants' Third Amended Complaint (the one on which judgment was entered) sought declaratory and injunctive relief, as well as conse-quential monetary damages if the Ordinance were declared invalid.

**12.** Perhaps, in view of the potential for being placed in an awkward tactical position by the City Attorney's stance regarding the legality of the conceptual proposal that became the Ordinance, the City sought outside counsel to represent it in this litigation.

ments, including expert deposition testimony, which, in their view, supported the conclusion that the City was not entitled to judgment as a matter of law. Specifically, Appellants suggested, among other things, the following:

- That the text and legislative history of the Ordinance exhibited an overt animus toward renters, and that, rather than being intended to protect tenants by capping rents, the Ordinance was intended to force renters to move to nearby apartment buildings and away from so-called "single-family" neighborhoods;

- That the Ordinance would not achieve the traditional goal of rent control programs, namely, lowering rents for tenants, because the Ordinance regulates only the least expensive rental housing in the City, traditional "single-family" housing, while failing to regulate the most expensive rental housing in the City, units in apartment buildings;

- That the Ordinance would, in fact, result in higher rental rates citywide by reducing the supply of the least expensive rental housing, units in traditional "single-family" neighborhoods;

- That the Ordinance lacked meaningful underlying empirical data supporting the use of rent control in the City, and that the Ordinance was unnecessary because home ownership in the City is not abnormally low and rental rates in the City are not unnaturally high;

- That the provisions of the Ordinance, including the use of CPI, the HUD value, and the percentage of assessed value figures in calculating the rent ceiling were arbitrarily designed by Councilman Catlin and unsupported by research or data; and,

- That problems with code violations by renters should be resolved by code enforcement measures, rather than using economic legislation to segregate renters from certain "single-family" neighborhoods.

In response to Appellants' contentions, the City tendered other evidentiary proffers and argument to the following effect:

- That the main purpose of the Ordinance was to address a perpetual shortage of available rental housing in the City due largely to the presence of the University of Maryland and the City's proximity to nearby metropolitan centers;

- That, because demand consistently outweighs supply for rental housing in the City, rental rates on single-family homes are disproportionate to the quality of those properties;

- That, according to its research, rented single-family homes are not maintained as well as owner-occupied homes and that the stock of such homes had begun to deteriorate;

- That high rental demand has raised the cost of purchasing a single family home in the City, leading to purchases largely by landlords intending to earn a profit on their purchase rather than maintain and monitor their properties or involve themselves in the community;

- That apartment buildings did not implicate the public welfare concerns that the Ordinance was designed to address, such as declining owner occupancy, high rental rates and deteriorating properties, and that placing rent ceilings on apartment buildings would discourage construction of new buildings, further disrupting the balance between supply and demand in the City's rental housing market;

- That rental homes accounted for a higher proportion of City code violations than owner-occupied properties, including citations for trash, litter, and lawn maintenance; and,

- That the Ordinance's employment of the CPI, the HUD level, and the percentage of assessed value figures was not arbitrary, but instead was based upon Councilman Catlin's calculations of the average landlord's investment, insurance, taxes, and maintenance costs, adding in an amount

for profit, Catlin's research reflecting that the HUD level was in the same range as his calculations while allowing for annual adjustments, and the use of CPI to determine rental rate increases by the City of Takoma Park.

On 26 November 2008, the Circuit Court concluded that, finding no triable issue of material fact, the Ordinance was constitutional and otherwise legally valid. Accordingly, it granted the City's motion for summary judgment on Appellants' claims, explaining, in a written order and memorandum opinion, that, as a matter of law: (1) the Ordinance did not constitute a deprivation of Appellant's equal protection or due process rights because the stated goals of the Ordinance were legitimate and the Ordinance's rent ceiling and exemption of apartment rental units were related rationally to those purposes; (2) the Ordinance does not represent impermissible de facto zoning by the City because the Ordinance does not control or direct the use of land directly or regulate rent based upon location; (3) the Ordinance does not violate the State and County Fair Housing Acts because it does not discriminate facially on the basis of age, occupation, marital status, or familial status; rather, the Ordinance discriminates among certain types of rental properties and not based on the characteristics of the renters themselves; and, (4) the Ordinance is not confiscatory facially.

On 26 January 2009, Appellants noted timely an appeal to the Court of Special Appeals. Prior to proceedings in that court, we granted certiorari, on our initiative, 411 Md. 599, 984 A.2d 244 (2009), to consider the following questions, as framed by Appellants in their brief:

1. Whether the Circuit Court erred in ruling that the Rent Control Ordinance satisfies the requirements of due process and equal protection under Article 24 of the Maryland Declaration of Rights.

2. Whether the Circuit Court erred in ruling that the Rent Control Ordinance does not violate the State and County Fair Housing Acts.

3. Whether the Circuit Court erred in ruling that the Rent Control Ordinance does not constitute impermissible zoning by the City of College Park.

## *STANDARD OF REVIEW*

Maryland Rule 2–501, entitled "Motion for summary judgment," provides in pertinent part:

(a) Motion. Any party may make a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law....

\* \* \*

(f) Entry of judgment. The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law....

Md. Rule 2–501 (2010); *see also Conaway v. Deane,* 401 Md. 219, 242–43, 932 A.2d 571, 584 (2007); *Charles County Comm'rs v. Johnson,* 393 Md. 248, 262–63, 900 A.2d 753, 761 (2006); *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005, 1010 (1993). One way to defeat a properly supported motion for summary judgment is for the party opposing the motion to demonstrate to the court that there is a triable genuine dispute as to a material fact. *Beatty,* 330 Md. at 737, 625 A.2d at 1011. The party opposing summary judgment must do more than show simply that there is "some metaphysical doubt as to the material facts." *Id.* at 738, 625 A.2d at 1011 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986)).

Whether a circuit court's grant of summary judgment is proper in a particular case is a question of law, subject to a non-deferential review on appeal. *Conaway,* 401 Md. at 243, 932 A.2d at 584; *Charles County Comm'rs,* 393 Md. at 263, 900 A.2d at 762; *Beatty,* 330 Md. at 737, 625 A.2d at 1011. As such, in reviewing a grant of summary judgment, we

review independently the record to determine whether the parties generated a dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law. *Charles County Comm'rs,* 393 Md. at 263, 900 A.2d at 762. We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the well-plead facts against the moving party. *Conaway,* 401 Md. at 243, 932 A.2d at 585; *Charles County Comm'rs,* 393 Md. at 263, 900 A.2d at 762.[13]

### DUE PROCESS AND EQUAL PROTECTION UNDER ARTICLE 24

Article 24 of the Maryland Declaration of Rights provides: That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Md. Decl. of Rts., Art. 24. Although the Maryland Constitution contains no similarly expressed equal protection clause, we have observed on numerous occasions that the concept of equal protection is embodied in the due process requirement of Article 24. *Conaway,* 401 Md. at 272 n. 33, 932 A.2d at 602 n. 33; *Verzi v. Baltimore County,* 333 Md. 411, 417, 635 A.2d 967, 969–70 (1994); *Kirsch v. Prince George's County,* 331 Md. 89, 96, 626 A.2d 372, 375 (1993); *Atty. Gen. v. Waldron,* 289 Md. 683, 704, 426 A.2d 929, 940–41 (1981). In addition, we have noted consistently that, as a general rule, we interpret Article 24 *in pari materia* with the Fourteenth Amendment to the United States Constitution, such that pertinent decisions of the Supreme Court are highly persuasive authorities; nevertheless, we recognize that Article 24 and the Fourteenth

---

**13.** We do not read Appellants' brief or reply brief to maintain clearly or seriously that reversal is required because there was demonstrated a triable genuine dispute of material fact. Rather, it appears from our reading of the briefs and reflection upon oral argument that Appellants desired to have the case resolved as a matter of law, on this record. We too shall oblige.

Amendment are independent and capable of divergent effect. *Conaway,* 401 Md. at 272 n. 33, 932 A.2d at 602 n. 33; *Verzi,* 333 Md. at 417, 635 A.2d at 970; *Waldron,* 289 Md. at 704, 426 A.2d at 941.

In order to determine whether a given statute or ordinance satisfies the due process requirement of Article 24, we ask rhetorically whether the legislative enactment, as an exercise of the legislature's police power, bears a real and substantial relation to the public health, morals, safety, and welfare of the citizens of the State or municipality. *Westchester West No. 2 Ltd. P'ship v. Montgomery County,* 276 Md. 448, 454, 348 A.2d 856, 860 (1975); *Bowie Inn, Inc. v. City of Bowie,* 274 Md. 230, 236, 335 A.2d 679, 683 (1975). In applying this test, courts perform a very limited function, resisting interference unless it is shown that the legislature exercised its police power arbitrarily, oppressively, or unreasonably. *Westchester West,* 276 Md. at 460, 348 A.2d at 863 (noting that "[p]rice control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty") (quoting *Nebbia v. New York,* 291 U.S. 502, 539, 54 S.Ct. 505, 517 78 L.Ed. 940, 958 (1934)); *see also Hargrove v. Bd. of Trustees of Md. Retirement Sys.,* 310 Md. 406, 427, 529 A.2d 1372, 1382 (1987); *Bowie Inn,* 274 Md. at 236, 335 A.2d at 683. The wisdom or expediency of a statute duly adopted by the legislative body is not subject to judicial scrutiny, and the statute will not be held void if there are any considerations relating to the public welfare by which it may be supported. *Hargrove,* 310 Md. at 427, 529 A.2d at 1382; *Westchester,* 276 Md. at 455, 348 A.2d at 860; *Bowie Inn,* 274 Md. at 236, 335 A.2d at 683. We have noted that "courts are under a special duty to respect the legislative judgment where the legislature is attempting to solve a serious problem in a manner which has not had an opportunity to prove its worth." *Bowie Inn,* 274 Md. at 237, 335 A.2d at 684. As such, courts should hesitate before invalidating an ordinance where doing so would deprive the legislative body contemplating such a

statute "of any opportunity to discover whether the chosen method will be good, bad or indifferent in its results." *Id.* at 237–38, 335 A.2d at 684.

 Where, as here, the legislative action at issue neither interferes with a fundamental right nor implicates a suspect classification,[14] the test for determining whether a statute violates the equal protection component of Article 24 is nearly identical to the due process examination. In such a case, we employ the least exacting and most deferential standard of constitutional review, namely, rational basis review, under which a legislative classification will pass constitutional muster so long as it is rationally related to a legitimate governmental interest. *Conaway,* 401 Md. at 273–74, 932 A.2d at 603–04; *Kane v. Bd. of Appeals,* 390 Md. 145, 172, 887 A.2d 1060, 1076 (2005); *Kirsch,* 331 Md. at 104, 626 A.2d at 379; *Hargrove,* 310 Md. at 424, 529 A.2d at 1381. In general, we will uphold a statute subject to rational basis review against an equal protection challenge unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that the court may conclude only that the governmental actions were arbitrary or irrational. *Conaway,* 401 Md. at 274, 932 A.2d at 604. We noted that a classification having a reasonable basis does not offend equal protection merely because it is not made with "mathematical nicety" or because in practice it results in some inequality. *Id.* at 275, 932 A.2d at 604; *Bowie Inn,* 274 Md. at 241, 335 A.2d at 686. In addition, we observed that legislative bodies are not required by equal protection to attack all aspects of a problem at the same time; rather, the legislative body "may select one phase of a problem and apply a remedy there, neglecting for the moment other phases of the problem." *Bowie Inn,* 274 Md. at 241, 335 A.2d at 686; *see also Lonaconing Trap Club, Inc. v. Md. Dep't of Env't,* 410 Md. 326, 346, 978 A.2d 702, 713 (2009).

---

**14.** Neither party contends that the Ordinance implicates a suspect classification or a fundamental right.

 Under both the due process and equal protection tests outlined *supra*, the challenged statute is presumed to be constitutional. *Lonaconing*, 410 Md. at 343, 978 A.2d at 711; *Conaway*, 401 Md. at 274, 932 A.2d at 604; *Westchester*, 276 Md. at 464, 348 A.2d at 865; *Bowie Inn*, 274 Md. at 236, 335 A.2d at 683. Where there are plausible reasons for the legislative action, the court's inquiry is at an end. *Conaway*, 401 Md. at 325, 932 A.2d at 635. In this vein, we have described rational basis review as " 'the paradigm of judicial restraint,' " noting that " '[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process [and] that . . . judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' " *Id.* (quoting *Fed. Commc'ns Comm'n v. Beach Commc'ns Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211, 221 (1993)); *see also Md. Aggregates Assoc. v. Md.*, 337 Md. 658, 673, 655 A.2d 886, 893–94 (1995). It is not the Court's "province to determine the fairness or desirability of legislative [decisions and] classifications;" that question is left to the legislature itself and ultimately to the affected electorate. *Hargrove*, 310 Md. at 424, 529 A.2d at 1381.

In applying these standards then, we must consider two questions with regard to Appellants' constitutional facial challenge to the Ordinance's validity, namely, (1) whether the Ordinance's stated objectives are legitimate governmental ends, and (2) whether the means chosen by the City in the Ordinance bear a rational relationship to achievement of those ends. *See Rios v. Montgomery County*, 386 Md. 104, 121, 872 A.2d 1, 10 (2005) (noting that, "unless a suspect or quasi-suspect class is created or a fundamental or important right is implicated," the appropriate standard of review under due process or equal protection analysis is rational basis review). For reasons we shall explain, we answer each question in the affirmative. As such, we conclude that the Circuit Court did not err in granting summary judgment to the City on Appellants' Article 24 claims, as plead.

As noted by Appellants, the traditional purpose of rent control regulation has been the protection of tenants from exorbitant rents. Appellants pointed at the summary judgment hearing in the Circuit Court to an "expert statement" from their expert witness, Dr. Stephen S. Fuller, a nationally recognized market economist, to this effect. Dr. Fuller explained:

[T]he rationale for rent control in its historic context ... focus[es] on two conditions: (1) protecting low-income tenants from owners who would otherwise be able to profit unfairly from monopolistic powers stemming from unusual market conditions, and (2) in response to rapid general inflation occurring during war time or severe economic conditions.

\* \* \*

The historic purpose of rent control programs was to have a broad-based effect on the rental stock in order to achieve the objective of the controls and not to burden smaller apartment operators or owners of individual units (condos, single-family units) with these regulations.

We noted as much in *Riger v. L & B Limited Partnership*, 278 Md. 281, 363 A.2d 481 (1976), where we stated that "[a] rent control program is designed to regulate the economy, stemming inflation in rental housing where normal market factors are not operating to keep housing costs down." *Id.* at 295, 363 A.2d at 490. Courts in other jurisdictions have noted similar traditionally-accepted problems for which rent control has been held to be a rational legislative response, including housing shortages, widespread imposition of exorbitant rents, monopoly control of the housing market, and the prevalence of substandard housing. *See, e.g., 440 Co. v. Borough of Ft. Lee,* 950 F.Supp. 105, 108 (D.N.J.1996) (finding that "the validity of a rent control ordinance depends upon the existence of conditions that justify the use of municipal police power to regulate prices," and that a municipality enacting a rent control ordinance must possess a set of facts which permit it to conclude rationally that "the competitive rental housing market is not

operating in the public interest" (quoting *Troy Hills Village v. Twp. Council of Parsippany–Troy Hills Twp.*, 68 N.J. 604, 350 A.2d 34, 40 (1975))); *MHC Operating Ltd. P'ship v. City of San Jose*, 106 Cal.App.4th 204, 130 Cal.Rptr.2d 564, 576 (2003) (noting that "the purpose of rent control" is to "prevent excessive rents"); *Apt. Ass'n of Greater L.A. v. Santa Monica Rent Control Bd.*, 24 Cal.App.4th 1730, 30 Cal.Rptr.2d 228, 229 (1994) (observing that "[r]ent control is a proper exercise of a city's police power if the regulation is 'reasonably calculated to eliminate excessive rents and at the same time provide landlords with a just and reasonable return on their property' " (quoting *Birkenfeld v. City of Berkeley*, 17 Cal.3d 129, 130 Cal.Rptr. 465, 491, 550 P.2d 1001 (1976))); *Dep't of Ins. v. Dade County Consumer Advocate's Office*, 492 So.2d 1032, 1042 (Fla.1986) (stating that the constitutional justification for rent control is "the protection of [tenants] from economic depredation by [landlords]"); *Brunetti v. New Milford*, 68 N.J. 576, 350 A.2d 19, 28 (1975) (noting that, in the context of rent control, rationales "include but are not limited to proof of a housing shortage, widespread imposition of exorbitant rents, monopoly control of rental housing market or prevalence of substandard housing"); *Somers Associates, Inc. v. Gloucester Twp.*, 241 N.J.Super. 323, 575 A.2d 20, 24 (App.Div.1990) (noting that the traditional primary purpose of rent control is "protection of tenants, usually with fixed or limited incomes, from burdensome impairments of their standard of living").

Nevertheless, courts also recognize a number of other legitimate governmental objectives in addressing housing concerns, including "the restoration and revitalization of urban housing," *see, e.g., Allen v. Brodie*, 573 F.Supp. 87, 90 (D.Md.1983), "promoting and preserving neighborhoods that are conducive to families," particularly those with young children, have stable populations, and have low traffic, *see Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 260 (Iowa 2007), and "preserving the character of single-family residential neighborhoods," *Anderson v. Provo City Corp.*, 108 P.3d 701, 708 (Utah 2005).

The stated objectives of the Ordinance are articulated in § 127–1.A, which describes the purpose of the City's rent control program as follows:

1. To encourage the University of Maryland and the private sector to provide suitable housing to meet the needs of undergraduate and graduate students on or near campus.

2. To encourage the availability of housing for households of all income levels, and to preserve, maintain and improve existing housing.

3. To strengthen College Park neighborhoods by reducing the number of single-family homes that are rental properties.

4. To encourage private reinvestment by homeowners consistent with a neighborhood's character.

City Code § 127–1.A. Although the above-stated goals differ from the traditional purpose of rent control legislation, namely, the protection of tenants from exorbitant rents, we cannot say, in light of the relevant case law and the broad discretion granted legislative bodies to determine and protect the public interest, that the goals of the Ordinance are illegitimate governmental ends.[15] We turn to consider whether the means selected by the City in the Ordinance are related rationally to achievement of those objectives.

As to the first two stated goals of the Ordinance, encouraging the availability of housing for households of all income levels, including university students, and preserving, maintaining, and improving existing housing, the City maintains that it is reasonable to believe that capping rent in

---

**15.** Appellants recast the City's goals in a sinister fashion, suggesting that the intent of the City in passing the Ordinance was to force student renters out of single-family neighborhoods by reducing the number of more affordable rental properties in those areas and to benefit one sector of the rental market (apartment buildings) at the expense of another (landlords in single-family neighborhoods). Although certain other considerations, such as those suggested by Appellants, may have contributed to the passage of the Ordinance, we confine our consideration in analyzing this facial constitutional challenge to the stated objectives of the Ordinance.

detached dwellings in single-family neighborhoods, but not in apartment buildings, will encourage builders, investors, and the University of Maryland to expedite the construction of apartment buildings capable of housing hundreds of renters in and near the City. In addition, the City asserts that the rent control program would reduce speculative pressure on home prices in single-family neighborhoods, thereby lowering home prices in those neighborhoods and make them more attractive for single-family use. The City contends that it is not irrational to believe that an acceleration in apartment building construction would improve the quality of housing options for renters and that increasing home ownership would help preserve, maintain, and improve housing in traditional residential neighborhoods on the theory that homeowners commit more resources to the maintenance of their homes than do renters and landlords. In response, Appellants direct our attention to the "expert statement" of Dr. Fuller to the effect that it is his opinion that the Ordinance would result in an increase in the cost of rental housing generally by restricting the supply of less expensive units in single-family neighborhoods, while permitting apartment buildings to increase rents due to increased demand, and that rent caps generally lead to further deterioration of rental properties.

Irrespective of the opinion evidence proffer presented by Appellants regarding Dr. Fuller's contrary view of the effect that the Ordinance may have on rental costs in the City and the City's existing housing stock, we cannot say that the City's perceived nexus between the rent control program and the goals of encouraging the availability of housing for households of all incomes is without any rational basis. It is entirely rational to believe that, by capping rents in the City's single-family neighborhoods, speculative investors will be less inclined to purchase such properties and, as a result, the price of those properties will be less inflated. Similarly, we are unprepared to say that the rent control program instituted by the Ordinance is not related rationally to the City's goal of preserving, maintaining, and improving existing housing. If rent control leads to increased construction of apartment buildings, landlords of other rental properties will be forced to improve

their properties in order to compete for rental business, and, as noted *supra*, a decrease in single-family home prices may lead to increased home ownership and, thus, improved maintenance of the City's existing housing stock. Although the City's rent control plan may not result ultimately in achieving these legislative goals, as argued by Appellants, even well-supported criticism of the Ordinance and its likely effects provides an insufficient legal basis to find the Ordinance to be violative of the protections of Article 24.[16]

 Regarding the Ordinance's second major goal, namely, strengthening City neighborhoods by reducing the number

---

**16.** Such a debate is at the very heart of the legislative process and, if the City's intended goals fail to come to fruition as the result of the application of the Ordinance (the Ordinance provides for a 1 September 2012 "sunset" of its terms, at which time its effectiveness may be evaluated), the City is free to learn from its mistakes. In addition, should they be disappointed in the results of the rent control experiment, Appellants and others may exercise their political voices by voting for other candidates for Mayor and the City Council. Nevertheless, as noted *supra*, a court is not permitted to judge the wisdom or expediency of a given legislative action under rational basis review. Rather, our inquiry is confined to determining whether there is a rational basis to believe that the City's chosen means may effectuate its legitimate goals.

The opinion of the Iowa Supreme Court in *Ames* shares that view. *Ames*, like the procedural track taken by the present case, was decided by the trial court in favor of the city by the grant of summary judgment in a declaratory judgment action. The Iowa Supreme Court affirmed. In that case, the court considered the validity of a city zoning ordinance which only permitted single-family dwellings in certain areas of the city, and defined "family" as "any number of related persons or no more than three unrelated persons." *Ames*, 736 N.W.2d at 257. Upon equal protection challenge by a city landlord association, the court upheld the validity of the ordinance, finding that it was related rationally to the government's interest in providing quiet neighborhoods, even though the classification between related and unrelated persons relied heavily on stereotypes that groups of unrelated persons living together typically do not establish roots in the community, do not provide playmates' for neighbors' children, attract large numbers of friends, and create additional noise and traffic. *Id.* at 261–63. In addition, the court noted that, although the landlord association may be correct that the ordinance would do little to further the city's goals, it was the city's prerogative "to fashion remedies to problems affecting its residents" and that, should the ordinance prove ineffective, "the elected city

of single-family homes that are rental properties, the City relies on research explicated in the Sage Report demonstrating that renters are cited more frequently for litter and garbage violations than occupying homeowners. Appellants retort by explaining, in considerable detail, that although renters are cited more frequently for litter and garbage violations than homeowners, other portions of the same data base shows that homeowners are more frequent violators of the City code in other ways, such as the presence of inoperable vehicles and "miscellaneous" violations. According to Appellants, this revelation undermines the City's claim that instituting rent control will strengthen City neighborhoods by reducing code violations. Nevertheless, it is not Appellants' nor this Court's prerogative to determine which municipal code violations are more serious and pose a greater threat to the citizens of College Park; that judgment rests in the hands of the City. We shall not second-guess the City's determination as to which code violations to target and how best to overcome their pernicious effects. In addition, it is not clearly irrational for the City to believe that apartment buildings, where renters enjoy highly convenient waste services and pathways between units are generally confined inside the buildings, do not contribute in similar fashion to violations of the City code as do renters in detached "single-family" properties. Thus, we cannot say that the Ordinance is unrelated to the City's goal of strengthening City neighborhoods.

▇▇▇ Regarding the Ordinance's final purpose, encouraging private reinvestment by homeowners consistent with a neighborhood's character, we agree with the City's contentions that it is not irrational to believe that neighborhoods with a high number of private, owner-occupied residences, which, according to the City, will be the likely result of its rent control program, will be more stable than neighborhoods populated by properties whose market prices are driven by absentee landlords speculating on the future of the rental market. The

council may change course and amend or repeal" the ordinance. *Id.* at 263.

opinion of the Utah Supreme Court in *Anderson* reached a similar conclusion. In that case, the City of Provo amended a zoning ordinance governing residential neighborhoods near Brigham Young University to allow only those homeowners who reside in their homes to rent out "accessory apartments," resulting in a distinction drawn between occupying and non-occupying landlords. *Anderson,* 108 P.3d at 703. Against an equal protection challenge, the court upheld the validity of the amendment, concluding that the disparity in treatment was justified reasonably by the council's "stated objective of balancing the city's competing interests in accommodating student housing needs and in preserving the character of single-family residential neighborhoods." *Id.* at 708. Specifically, the court noted that the city concluded reasonably that "preventing absentee landlords from dominating ... neighborhoods would help to retain the neighborhoods' single family character rather than converting them, in effect, to duplexes with both units often occupied by semitransient residents." *Id.*

As acknowledged *supra,* it is possible that the City's rent control program may prove unsuccessful in addressing effectively the goals identified in § 127–1.A. Nevertheless, it is clear that, despite Appellants' considerable criticism of the City's methods and legislative fact-finding, the City is not without a rational basis to its belief that the Ordinance may achieve its stated objectives. As such, we hold that the Ordinance does not violate on its face Appellants' due process and equal protection rights under Article 24 because there is a rational relationship between the purported goals of the Ordinance, which we have found to be in the acceptable range of legitimacy, and the method chosen by the City to achieve those goals, namely, imposition of a rent control regime.[17]

---

**17.** Appellants contend additionally that the Ordinance violates their equal protection rights because it targets unfairly students. In making this argument, Appellants rely heavily on our decision in *Kirsch.* In *Kirsch,* we invalidated the Prince George's County "minidorm" zoning ordinance, which regulated rental of residential property to three or more students pursuing higher education, finding that the ordinance

## STATE AND COUNTY FAIR HOUSING ACTS

■ Maryland Code, State Government Article § 20–705, entitled "Discriminatory housing practices-Sale or rental of dwelling," provides in pertinent part:

Except as provided in §§ 20–703 and 20–704 of this subtitle, a person may not:

(1) refuse to sell or rent after the making of a bona fide offer, refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, disability,

deprived students of equal protection. *Kirsch*, 331 Md. at 91, 107–08, 626 A.2d at 373, 381. Specifically, we found that the ordinance's classification was based "solely on the occupation which the tenant pursues away from [their] residence," and concluded that such a distinction was an arbitrary classification not related rationally to the County's objective of clearing residential neighborhoods of noise, litter, and parking congestion. *Id.* at 106, 626 A.2d at 380.

Although the Ordinance at issue here may have a considerable impact on students in the City, because they are nearly always renters rather than homeowners, *Kirsch* does not control here. The Ordinance does not make distinctions on the basis of occupation (students versus non-students). Rather, its operative premise is based on the type of rental property in question. Although in *Kirsch* we concluded that the distinction between students and nonstudents bore no rational relationship to the goal of reducing noise, litter, and parking congestion because both groups were equally capable of committing such violations, the City presented a considerable evidentiary proffer suggesting that capping rent on single-family homes, while exempting apartment buildings, will lead to the accomplishment of its goals of making housing in the City more affordable, reducing the number of certain code violations, and stabilizing residential neighborhoods in the City.

Appellants make the further contention that the methods chosen by the City to calculate the rent ceiling, including the use of CPI, the HUD value, and the percentage of assessed value figure, were chosen arbitrarily by Councilmember Catlin and the City Council and bear no rational relationship to the goals set forth in the Ordinance. We disagree. The City provided the Circuit Court with explanations underlying its reliance on those figures which demonstrated that they were not chosen in an entirely arbitrary fashion. Likewise, in light of those facts, we cannot say that use of these figures in calculating the rent ceiling is unreasonable completely. *See Brunetti*, 350 A.2d at 27 (finding that formulae for calculating rent increases that rely on CPI or fixed percentage rates "bear a rational relation to the legitimate municipal purpose of stabilizing rental levels").

marital status, familial status, sexual orientation, or national origin;

(2) discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with the sale or rental of a dwelling, because of race, color, religion, sex, disability, marital status, familial status, sexual orientation, or national origin; ...

Md.Code (1984, 2009 Repl.Vol.), State Gov't Art. § 20–705. The prohibition against discriminatory housing practices extends to local governments, which may enact housing-related ordinances so long as the ordinance "does not authorize any act that would be a discriminatory housing practice under this subtitle." Md.Code, State Gov't Art. § 20–703(4). Thus, Prince George's County Code § 2–210, entitled "Sale or rental of housing; exception," provides in pertinent part:

(a) No person, whether acting for monetary gain or not, shall:

(1) Refuse to sell, lease, sublease, rent, assign, or otherwise transfer; or refuse to negotiate for the sale, lease, rental, assignment or other transfer of the title, leasehold, or other interest in any housing; or represent that housing is not available for inspection, sale, lease, sublease, rental, assignment, or other transfer when in fact it is so available; or otherwise make housing unavailable, deny, or withhold any housing from any person because of race, religion, color, sex, national origin, age, occupation, marital status, political opinion, personal appearance, sexual orientation, physical or mental handicap, or familial status;

\* \* \*

(2) Include in the terms, conditions, or privileges of any sale, lease, sublease, rental, assignment, or other transfer of any housing, any clause, condition, or restriction discriminating against any person in the use or occupancy of such housing because of race, religion, color, sex, national origin, age, occupation, marital status, political opinion,

personal appearance, sexual orientation, physical or mental handicap, or familial status;

Prince George's County Code (2003 & Supp. 2005) § 2–210(a).

According to Appellants, the Ordinance's text and legislative history demonstrate that it was enacted for the discriminatory purpose of removing renters, particularly student renters, from residential neighborhoods in the City and segregating them from homeowners because the City believes that renters are undesirable neighbors. On this basis, Appellants contend that the Ordinance violates the State and County Fair Housing Acts by discriminating in housing on the basis of age, occupation, marital status, or familial status. We disagree.

By its very terms, the classification employed by the Ordinance distinguishes between rental units in traditional single-family neighborhoods and rental units in apartment buildings, among other types of excepted properties. On its face, the Ordinance does not discriminate in violation of the State or County Fair Housing Acts because it does not distinguish impermissibly between groups based on some characteristic of the group. Although it is true that the Ordinance may impact students more than any other demographic of renters due to the fact that most renters in the City are students at the University of Maryland, this alone cannot form a basis to conclude that the Ordinance discriminates facially on the basis of age, occupation, marital status, or familial status. As noted by the Circuit Court, people of every age, occupation, marital status, and familial status will be affected in the same manner if they live in rental housing in single-family neighborhoods. Thus, we conclude that the Ordinance on its face does not violate the State or County Fair Housing Acts.

## DE FACTO ZONING

■ With the exception of the City of Laurel, municipal corporations within Prince George's County, including the City of College Park, are "not authorized, by means of an amendment to its charter or otherwise, to exercise any of the powers relating to planning, subdivision control, or zoning granted by

the Maryland–National Capital Park and Planning Commission or the County Council of Prince George's County." Md. Code, Art. 28, § 7–103(b). Appellants contend that the Ordinance must be nullified as an act of "de facto zoning" by the City, beyond its enumerated powers. They are mistaken.

In *Maryland Overpak Corp. v. Mayor & City Council*, we defined zoning as the " 'process of setting aside disconnected tracts of land varying in shape and dimensions, and dedicating them to particular uses in some degree to serve the interests of the whole territory affected by the plan.' " 395 Md. 16, 48, 909 A.2d 235, 254 (2006) (quoting *Bd. of County Comm'rs v. Stephans*, 286 Md. 384, 388–89, 408 A.2d 1017, 1019 (1979)). Similarly, we observed that " '[t]he very essence of zoning is a territorial division according to the character of the land and the buildings, their peculiar suitability for particular uses, and uniformity of use within the zone.' " *Donnelly Adver. Corp. v. City of Baltimore*, 279 Md. 660, 665, 370 A.2d 1127, 1130 (1977) (quoting *Heath v. Mayor & City Council*, 187 Md. 296, 305, 49 A.2d 799, 804 (1946)); *see also Appleton Reg'l Cmty. Alliance v. County Comm'rs*, 404 Md. 92, 101, 945 A.2d 648, 653 (2008) (defining "zoning action" as one which " 'decides the use of a specific parcel or assemblage of parcels of land' and 'creates or modifies substantively the governing zoning classification or defines the permissible uses, building and lot sizes, population density, topographical and physical features, and other characteristics of a specific parcel or assemblage of parcels of land ....' " (quoting *Md. Overpak*, 395 Md. at 50, 909 A.2d at 255)).

As noted by the City in its brief, the Ordinance does not divide the City into districts, define lot sizes, or mandate particular uses of any specific parcels or buildings. Rather, the Ordinance sets a limit on the amount of rent a single-family property owner may charge his or her tenants. That the Ordinance may contemplate land use changes, *i.e.*, shifting rental housing into apartments and out of single-family neighborhoods, does not inherently convert what is a rent control ordinance into a zoning ordinance. *See Donnelly*, 279 Md. at 665–66, 370 A.2d at 1130–31 (finding that a municipal ordi-

nance regulating signs under the police power was not an exercise of zoning power "[a]lthough it is within the scope of the zoning power to regulate signs"). As such, we reject Appellants' characterization of the Ordinance as an attempt by the City to engage in impermissible "de facto zoning."

## IS THE ORDINANCE CONFISCATORY?

■ Finally, Appellants contend that the City's method for calculating the rent ceiling, on its face, cannot possibly ensure a fair return on landlords' investments and, for that reason, is impermissibly confiscatory. A number of courts have found that rent control regulations may be considered to have a confiscatory effect "if no rent adjustment mechanism is provided" and the terms of the rent control ordinance "will not permit those who administer it to avoid confiscatory results in its application to the complaining parties." *Apt. Ass'n of Greater L.A.*, 30 Cal.Rptr.2d at 232; *see also Richardson v. City and County of Honolulu*, 802 F.Supp. 326, 332–33 (D.Haw.1992) (noting that a municipal rent control ordinance may be facially confiscatory where it provides "no meaningful mechanism for obtaining relief when the lease rent formula results in a confiscatory rate"). For example, in *Brunetti,* the New Jersey Supreme Court observed that an ordinance may be confiscatory where it is so restrictive as to preclude facially any possibility of a just and reasonable return for landlords. 350 A.2d at 27. In that case, however, the court determined that the rent control ordinance at issue, which fixed rents at a given base level and permitted annual increases in rental charges, was not confiscatory facially because, although the annual increases were not unlimited, the ordinance permitted landlords to apply for unlimited rental increases in the event that he or she could demonstrate that he or she could not realize a reasonable profit from his or her investment. *Id.* Thus, in the court's eyes, the ordinance did not preclude facially the recovery of a just and reasonable return and, for that reason, was not impermissibly confiscatory. *Id.* On the other hand, in *Helmsley v. Borough of Ft. Lee,* 78 N.J. 200, 394 A.2d 65 (1978), the court invalidated as confiscatory a rent

control scheme which limited any rent increases to 2.5% of the base rent and contained a lengthy and burdensome hardship relief mechanism, noting that, where a municipality desires to enact rent control, "it must be prepared to protect the landlords' interests by providing prompt, fair, and efficacious administrative relief" if imposition of the ceiling results in confiscatory rates of return. *Id.* at 81, 85–86.

The Ordinance here accounts clearly on its face conceptually for landlords to receive a fair return on their investment.[18] For example, where a landlord petitions the Board for an upward adjustment in the permissible annual rent increase, the Board is required to take into account the landlord's rate of return. § 127–7.C(1)(h). That section provides "that individual upward adjustments in the rent ceilings on units be made only *when the landlord demonstrates that such adjustments are necessary to provide the landlord with a fair return on investment.*" § 127–7.C(2) (emphasis added). Furthermore, § 127–7.I states that "[n]o provision of this Chapter shall be applied so as to prohibit the Board from granting an individual rent adjustment that is demonstrated necessary by the landlord to provide the landlord with a fair return on investment." § 127–7.I. It is clear that, on its face, the Ordinance balances the City's goals of capping rent levels while maintaining an avenue for a landlord to obtain a fair return on his or her investment. Absent proof by Appellants that application of the Ordinance's rent ceiling and the Ordinance's related adjustment procedure results in unreasonably limited rates of return (no such facts admissible in evidence exist in this record), we cannot say that the Ordinance is confiscatory on its face.[19]

---

18. The parties concede that no landlord has applied to the Board for an adjustment under the Ordinance.

19. Appellants contend that the purpose of the Ordinance, namely, to make rental conversions less profitable for landlords in order to reduce the number of rental properties in single-family neighborhoods, contradicts a finding that the statute is not facially confiscatory. We disagree. Although the Ordinance places limits on the profitability of rental units, such a fact does not mean inherently that landlords will be unable to

## CONCLUSION

Appellants waged unsuccessfully their battle against the City's initiative for a rent control program in the legislative arena. Undeterred, they turned to the Circuit Court, seeking essentially a spring board declaration that the Ordinance was unconstitutional on its face or otherwise legally invalid. In the view of that court, the Ordinance does not violate Article 24 because the City's goals in enacting the Ordinance were legitimate and the means selected to achieve those goals were rational, putting aside the likelihood of success. Similarly, the Circuit Court held that the Ordinance does not discriminate against student renters in violation of the State and County Fair Housing Acts, nor does it constitute an impermissible act of "de facto zoning" by the City. Finally, the trial court concluded that the Ordinance does not effect a facially confiscatory taking, as it permits landlords the ability to petition the Board for individual adjustments to the rent ceiling in order to maintain a fair rate of return. The Circuit Court recognized that even considerable and legitimate criticism of a legislature's chosen path will not provide the fodder for judicial interference in the legislative process, so long as the legislature's actions are calculated reasonably to achieve legitimate governmental ends. Indefatigably, Appellants pressed their arguments to us. Finding no substantial basis to disagree with the Circuit Court, we shall affirm.

· **JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**

BELL, C.J., BATTAGLIA, and MURPHY, JJ., Dissent.

---

earn a fair return on their investments. Rather, landlords renting rent-controlled properties will no longer be permitted to determine unilaterally their profit margin return from their investments and, as such, may be dissuaded from renting such properties.

BATTAGLIA, J., dissenting in which BELL, C.J., and MURPHY, J., join.

I respectfully dissent. The majority erroneously concludes that the rent control ordinance at issue in this case furthers a legitimate governmental purpose and, thus, does not violate Article 24 of the Maryland Declaration of Rights.[1] I disagree with that contention, for reasons that follow, and consequently, would reverse with instructions to grant summary judgment in favor of the Appellants, Alan Tyler, et al.

As the majority explains, it is well-settled that Article 24 contains an implied equal protection guarantee, despite the fact that its text contains no explicit language pertaining to equal protection. Majority op. at 499–500, 3 A.3d at 434–35; *Lonaconing Trap Club, Inc. v. Md. Dep't of the Env't*, 410 Md. 326, 340 n. 15, 978 A.2d 702, 710 n. 15 (2009); *Verzi v. Balt. Cnty.*, 333 Md. 411, 417, 635 A.2d 967, 969–70 (1994); *Murphy v. Edmonds*, 325 Md. 342, 353, 601 A.2d 102, 107 (1992). *See also Atty. Gen. v. Waldron*, 289 Md. 683, 704 n. 8, 426 A.2d 929, 941 n. 8 (1981) (explaining that the Supreme Court has reached a similar result in interpreting the Due Process Clause of the Fifth Amendment). I further agree with the majority (and both parties) that the rational basis test applies to the instant case, because "neither a suspect class nor a fundamental right or interest is implicated," and thus, heightened scrutiny does not apply. *Id.* at 706–07, 426 A.2d at 942.

Under rational basis review, a statute is presumed constitutional, and a party alleging otherwise must prove by clear and convincing evidence that the statute either does not further a legitimate state interest, *Verzi*, 333 Md. at 418, 427, 635 A.2d at 970, 975, or that "the means chosen by the legislative body are 'wholly irrelevant to the achievement of the State's objective.'" *Waldron*, 289 Md. at 707, 426 A.2d at 942, quoting

---

1. Article 24 of the Maryland Declaration of Rights provides:

 That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

*McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399 (1961); *accord Lonaconing,* 410 Md. at 343, 978 A.2d at 711–12 ("Furthermore, 'the party attacking [a statutory classification] must show by clear and convincing evidence that it does not rest upon any rational basis but is essentially arbitrary.' ") (quoting *Md. Dep't of Transp. v. Armacost,* 299 Md. 392, 409, 474 A.2d 191, 199 (1984)). Nevertheless, our cases demonstrate that rational basis review is not " 'toothless.' " *Waldron,* 289 Md. at 710, 426 A.2d at 944, quoting *Mathews v. Lucas,* 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651, 664 (1976).

In *Attorney General v. Waldron,* 289 Md. 683, 426 A.2d 929, we applied the rational basis test to invalidate a statute that prohibited retired judges from practicing law if they accepted their pensions. We cited approvingly to *Dasch v. Jackson,* 170 Md. 251, 183 A. 534 (1936), in which our predecessors invalidated, on equal protection grounds, "a statute which purported to license and regulate paperhangers in Baltimore City while failing to include paperhangers elsewhere within its coverage." *Waldron,* 289 Md. at 718, 426 A.2d at 948. We said that, " 'except for revenue,' " the State " 'may not annex any burdensome conditions on the common callings of life or the right of the individual to engage therein, unless such regulation is required for the protection of the public health, safety, or morals.' " *Id.* at 720, 426 A.2d at 949, quoting *Dasch,* 170 Md. at 268, 183 A. at 541. We further explained that where the State exercised its police powers to impose such a regulation, " *'any classification, adopted for the purposes of the regulatory measure, must be reasonable, uniform in its operation within the class, and based upon some legitimate principle of public policy.'* " *Id.* (emphasis added in *Waldron* ).

Likewise, in *Kirsch v. Prince George's County,* 331 Md. 89, 626 A.2d 372 (1993), we held that a so-called "mini-dorm" zoning ordinance violated equal protection. The ordinance, enacted by Prince George's County, but apparently intended to combat a perceived problem concerning noise, litter, and parking in neighborhoods surrounding the University of Mary-

land at College Park,[2] *id.* at 105–06, 626 A.2d at 380, defined a "mini-dormitory" as:

> "An off-campus residence, located in a building that is, or was originally constructed as a one-family, two-family, or three-family dwelling which houses at least three (3), but not more than five (5), individuals, all or part of whom are unrelated to one another by blood, adoption or marriage and who are registered full-time or part-time students at an institution of higher learning."

*Id.* at 93, 626 A.2d at 373–74, quoting Prince George's County Code (1990), Section 27–107.1(a) (150.1) (emphasis omitted). Because no suspect class or fundamental right was implicated, we applied the rational basis test. *Kirsch,* 331 Md. at 104, 626 A.2d at 379. We, nevertheless, held that the zoning ordinance was not rationally related to its stated "objective of clearing residential neighborhoods of noise, litter, and parking congestion." *Id.* at 106, 626 A.2d at 380. We reasoned that differentiating "between permissible residential tenant classes by creating more strenuous zoning requirements for some and less for others based solely on the occupation which the tenant pursues away from that residence [was] that sort of arbitrary classification forbidden under our constitutions." *Id. See also id.* at 104–05, 626 A.2d at 379–80 (collecting cases where we applied the rational basis test to invalidate statutes regulating occupations, because the classification schemes were essentially arbitrary).

In *Verzi v. Baltimore County,* 333 Md. 411, 635 A.2d 967, we determined that a county ordinance mandating that a licensed tow operator maintain a place of business within that county as a precondition for eligibility to be called by police

---

**2.** The City of College Park does not possess zoning authority. *See* Md.Code (1957, 2003 Repl.Vol.), Art. 28, § 7–103(b) (stating, in relevant part, that a municipal corporation within the Maryland–Washington Regional District "is not authorized, by means of an amendment to its charter or otherwise, to exercise any of the powers relating to planning, subdivision control, or zoning granted by the Maryland– National Capital Park and Planning Commission or the County Council of Prince George's County").

for towing vehicles disabled by accidents, violated equal protection. We could "find no rational basis for the distinction between in-county and out-of-county [tow operators]," and thus we were "led to the 'more reasonable and probable view ... that [the classification] was intended to confer the monopoly of a profitable business upon residents of the town.'" *Id.* at 427, 635 A.2d at 974, quoting *Mayor & City Council of Havre de Grace v. Johnson,* 143 Md. 601, 608, 123 A. 65, 67 (1923).

In the case at bar, we are faced with a classification of landlords: "favored" landlords, commercial enterprises that operate multi-occupant and high-rise apartment complexes; and "disfavored" landlords, primarily individuals who own single-family houses and rent them to students attending the University of Maryland at College Park. The openly-acknowledged purpose of the classification scheme is to depress rents that "disfavored" landlords can charge, so that the "favored" landlords are placed in a more advantageous position. The hope is that the single-family homeowners, unable to charge sufficient rents to cover their expenses, will cease their endeavors, thereby creating a decrease in the supply of "disfavored" rental units. This "engineered" rental housing shortage will then result in more "favored" apartment units in the City of College Park, built by commercial entrepreneurs.

What is striking about this scheme is that nowhere does it address the needs or interests of renters, nor does it protect the otherwise appropriate use of private property. Rather, the College Park rent control ordinance is intended to penalize a "disfavored" class of landlords, for the benefit of two other groups: a "favored" class of commercial landlords, whose bottom line will fatten through elimination of a competitor; and owner-occupants of single-family houses in the neighborhoods adjacent to the University, who do not rent their dwellings, and anticipate rising home prices (or perhaps greater quality of life) through elimination of the rental market for single-family houses.

Undoubtedly some renters, those fortunate enough to be able to continue occupying the rent-controlled housing, likely

also will benefit in the short term by paying below-market rents, but the ordinance does not appear to countenance this result. The ultimate result of the ordinance appears likely to be higher rents, on average, than would otherwise prevail in its absence, because the clear purpose and likely effect will be to create an artificial shortage of the least expensive rental units, while encouraging profiteering by the operators of the most expensive units.

I also would point out that the City's assertion that the "disfavored" rental properties are to blame for the lion's share of code enforcement problems has little or no evidentiary support in the record. Although it may be sufficient to hypothesize any reasonably conceivable state of facts tending to support a statutory classification scheme, *Montgomery Cnty. v. Fields Road Corp.*, 282 Md. 575, 580, 386 A.2d 344, 347 (1978) (" 'When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.' ") (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, 377 (1911)), such a presumption still must be *reasonable.* In my view, if code enforcement is a problem, the simple answer would be to *enforce* the housing code. In any event, any step short of closing down the University would be unlikely to ameliorate the problem, because the concerns raised by the City are caused, ultimately, by the students themselves.

Finally, without addressing Tyler's contention that the rent control ordinance is confiscatory, the "review" process also raises due process concerns. College Park Code Section 127–7 authorizes the Rent Stabilization Board to grant "individual rent ceiling adjustment[s]" when persuaded by a preponderance of the evidence "that such adjustments are necessary to provide the landlord with a fair return on investment." Code Section 127–8 authorizes the Board to grant "temporary exemption[s]" in cases of "extreme financial hardship because of mortgage or financial obligations related to the property incurred before the effective date of [the Ordinance]." Each of

these sections provides the Board with what amounts to unbridled discretion to determine what constitutes a *fair* return on investment or what constitutes an *extreme* financial hardship. Permitting the Board to apply such amorphous standards is tantamount to granting the Board legal authority to act arbitrarily and capriciously.

Admittedly, the statutory scheme may stifle the ability of private homeowners to rent their dwellings to college students, which is its purpose. This does not mean, however, that the rational basis test is satisfied. Rather, it is the purpose itself, I would submit, that is illegitimate.

To diminish the capacity of private homeowners to rent their properties through a deliberate scheme to squeeze rents below that required for maintenance and a fair operating profit, in favor of commercial vendors not similarly constrained, absent a legitimate public benefit, is to permit the government to act as a henchman for high rise owners, not a steward of the public interest. There is no reasonable argument that leasing one's house to a tenant is against the public interest or should be legally disfavored in any way. *See, e.g., Simard v. White,* 383 Md. 257, 269 n. 11, 859 A.2d 168, 175 n. 11 (2004) (warning against assaults on property rights " 'carried out in the name of "common good," an elastic concept, defined by those whose interests it serves' ") (quoting Richard Pipes, *Property and Freedom* 225 (1999)). Consequently, there is no *legitimate public* purpose furthered by the City rent-control ordinance in the present case, but rather, a private benefit conferred on a class that may be favored in the political realm. As in *Verzi,* I can "find no rational basis for the distinction between [high-rise landlords] and [landlords renting out single-family houses]," and thus am "led to the more reasonable and probable view . . . that [the classification] was intended to confer the monopoly of a profitable business upon [favored interests]." 333 Md. at 427, 635 A.2d at 974 (internal quotation marks omitted). I respectfully dissent.

Chief Judge BELL and Judge MURPHY have authorized me to state that they join in this opinion.