*Dorothy C. Mergner v. Estate of John G. Mergner, Sr.*, No. 0390, September Term 2022.
Opinion by Kehoe, Christopher, J. Filed January 31, 2025.

**FAMILY LAW — ELECTIVE SHARE OF SURVIVING SPOUSE — WAIVER OF RIGHT TO ELECTION — ESTOPPEL**

In 2016, Dorothy Mergner ("Dorothy") and her spouse, John G. Mergner, Sr. ("John"), signed a marital property agreement which provided, among other things, that:

> (1) John would establish an irrevocable trust for the benefit of Dorothy during her life with the principal payable after her death to members of his family from a previous marriage; and

> (2) Dorothy would waive her right to all claims against property owned by John including her right to claim a share of his estate as his surviving spouse.

John established and funded the trust. The trust provided that Dorothy would receive the income generated by the trust on a monthly basis.

In 2021, Dorothy filed the current action, in which she sought a declaratory judgment that the marital property agreement was unenforceable. By that time, Dorothy had received $450,000 in monthly income from the trust and continued to receive income from the trust thereafter. In his answer to Dorothy's complaint, John alleged that her claim against him was "barred based upon [her] failure to surrender all the benefits she [had] received" from the trust. Because Dorothy continued to accept the income generated by the trust, she is estopped from challenging the validity and enforceability of the marital property agreement.

Circuit Court for Montgomery County
Case No. 483567V

IN THE APPELLATE COURT OF

OF MARYLAND

No. 390

September Term, 2022

_____

DOROTHY C. MERGNER

v.

ESTATE OF JOHN G. MERGNER, SR.

_____

Kehoe, C.,**
Leahy,
Zic,

JJ.

_____

Opinion by Kehoe, C., J.

_____

Filed: January 31, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

* Tang, Rosalyn, J., and Kehoe, Stephen, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

** Kehoe, Christopher, now retired, participated in the hearing of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the preparation of this opinion.

Dorothy C. Mergner wishes to take a spousal elective share of the estate of her late husband, John G. Mergner, Sr. (the "Estate") pursuant to Md. Code, Est. & Trusts §§ 3-401–413. Bonnie J. Lawless, Esquire, in her capacity as the personal representative of the Estate, asserts that Ms. Mergner does not have the right to do so.[1] The Circuit Court for Montgomery County agreed with the Estate. Ms. Mergner raises two issues on appeal, which we have reworded:

> 1. Did the circuit court err in granting the Estate's motion for partial summary judgment?

> 2. Did the trial court err in entering judgment in favor of the Estate when Dorothy failed to present evidence as to what property, if any, was not included in the definition of "Separate Property" under the marital property agreement?[2]

---

[1] In their briefs and in papers filed in the circuit court, the parties refer to Ms. Mergner as "Dottie," Mr. Mergner as "John," and Ms. Lawless as "Bonnie." We will follow the parties' lead as to Mr. Mergner, but we will refer to Ms. Lawless as "Ms. Lawless" and Ms. Mergner as "Dorothy."

[2] In her brief, Dorothy frames the issues as follows:

> 1. Did the circuit court err in granting John partial summary judgment based on the court's conclusion that Dottie waived her right to challenge validity of the marital property agreement by retaining the income she had received from the irrevocable trust?

> 2. Did the circuit court err in entering judgment in favor of John's estate based on the court's conclusion that the marital property agreement's definition of "Separate Property" is unambiguous?

The Estate articulates the issues thus:

> 1. Did the trial court err in granting John's Motion for Summary Judgment where no material facts were submitted to oppose the motion that established that Dottie was fully aware of the Marital Property Agreement

(Footnote Continued . . . .)

Additionally, the Estate has filed a motion to dismiss this appeal on the grounds that it is moot because Dorothy did not file a notice of her choice to take an elective share of the Estate within the time limits set out in Est. & Trusts § 3-407.[3]

For the reasons that we will explain, we conclude that the circuit court did not err when it entered judgment in favor of the Estate. We deny the Estate's motion to dismiss the appeal.[4]

---

and Irrevocable Trust by at least February of 2020 and continued to accept and retain the benefits from the Agreement?

2. Did the trial court err in entering judgment in favor of the Estate when Dottie failed to present any evidence as to what property, if any, was not included in the definition of "Separate Property" under the Mar[it]al Property Agreement?

[3] Md. Code, Est. & Trusts § 3-407 states in pertinent part:

(a)(1) The election by a surviving spouse to take an elective share shall be made within the later of:
(i) 9 months after the date of the decedent's death; or
(ii) 6 months after the first appointment of a personal representative.
(2)(i) Within the period for making an election, the surviving spouse may file with the court a petition for an extension of time, with a copy given to the personal representative.
(ii) For good cause shown, the court may extend the time for election for a period not to exceed 3 months at a time.

\* \* \*

[4] The Estate's motion was based in large part on the holding and the Court's reasoning in *Downes v. Downes*, 388 Md. 561, 572–74 (2005). In *Downes*, the surviving spouse filed a motion to extend the period to elect against her deceased spouse's estate after the deadline for filing such a request had expired. The Court concluded that:

The authority of the orphans' court to grant an extension . . . for the making of an election . . . is . . . clearly conditioned on a request for the extension

(Footnote Continued . . . .)

BACKGROUND

Dorothy and John were married in 1996. Both had been married before. Dorothy has an adult child from a previous marriage and John had several children from his previous marriage. Dorothy has a high school diploma. For much of her adult life, she was employed by a labor organization in Baltimore. She did not work in the years that she and John were married. John's educational attainments are not clear from the record but he worked as a wealth manager and financial advisor for Morgan Stanley. John and Dorothy did not have a prenuptial agreement.

---

being filed with the court prior to the expiration of the most recent allowable period.

*Id*. at 572.

John passed away on January 21, 2022, and Ms. Lawless was appointed as personal representative of his estate on February 15, 2022. The Estate asserts that Dorothy's deadline for filing a notice of intent to claim against the Estate was October 21, 2022. *See* Est. & Trusts § 3-407. Dorothy filed her notice of claim on November 11, 2022.

In her response, Dorothy points out that Ms. Lawless was required to file an inventory and appraisal of the Estate's assets within three months of the date of her appointment as personal representative. *See* Est. & Trusts § 7-201 and § 7-202. Dorothy asserts that Ms. Lawless filed the information report and the inventory approximately three months after that deadline had expired. Dorothy presents a colorable argument that the time for her to file her election was tolled for that period. If she is correct, then her election was timely filed. The Estate did not address this issue and its failure to do so is dispositive. *See Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 674 (2024) ("[I]f a point germane to the appeal is not adequately raised in a party's brief, the court may, and ordinarily should, decline to address it." (quoting *DiPino v. Davis*, 354 Md. 18, 56 (1999)).

In 2011, John and Dorothy consulted with Ms. Lawless regarding estate planning matters. Based on her discussions with her clients, Ms. Lawless prepared a revocable trust agreement for each of them. Among its terms, John's revocable trust agreement provided that, if he predeceased Dorothy, she would be the beneficiary for the remainder of her life of a trust consisting of 50% of the trust assets at the time of his death or five million dollars, whichever was greater. After Dorothy's death, the balance of the trust was to be paid to John's descendants after payment of estate taxes.[5]

---

[5] The 2011 revocable trust did not contain a provision addressing the beneficiary's right to elect a spousal share of the deceased spouse's estate. Dorothy asserts that this is significant. We do not agree.

At the time the revocable trust agreements were executed, it was the law of Maryland that a spousal election applied only to the deceased spouse's "net estate," which was defined as "the property of the decedent passing by testate succession[.]" Est. & Trusts § 3-203(a) (2011). We recognize that Maryland's caselaw regarding spousal elections under the prior statutory scheme was complex. *See, e.g.*, *Green v. Nassif*, 426 Md. 258, 269–85 (2012) (discussing issues pertaining to how a surviving spouse's elective share should be calculated). However, one matter was pellucidly clear: a surviving spouse's right to a spousal share of the deceased spouse's estate applied only to "the property of the decedent passing by *testate succession*." *Karsenty v. Schoukroun*, 406 Md. 469, 488 (2008) (emphasis in original; quotation marks and citation omitted).

In her response to John's motion for summary judgment, Dorothy asserted that "[a]t the same time that John signed [the 2011] estate planning documents, he transferred all of the assets held in his name, as well as his interests in the family assets held jointly, to his trust." The Estate does not dispute this statement.

To be sure, Maryland's law regarding spousal elections changed significantly on October 1, 2020, when chapter 435 of the Acts of 2019 became effective. Among other things, this statute provided that a surviving spouse's elective share is calculated on the deceased spouse's "augmented estate." *See* Est. & Trusts § 3-404. But, at the time that the 2011 trusts were executed, Dorothy's right to claim against his estate would have had little monetary value.

- 4 -

Dorothy also signed a revocable trust agreement at the same time but this document is not contained in the record extract or the Estate's appendix.

In approximately 2013, John began to experience a series of health problems that eventually forced him to stop working. According to Dorothy, she was unable to care for him.[6] John entered an assisted living facility in 2015 or 2016. At about the same time, Dorothy and John sold their residence and a vacation home. Part of the proceeds of these sales were used to purchase a unit in a residential condominium in Rockville, Maryland that was titled in Dorothy's sole name.

In the fall of 2015, Dorothy approached Ms. Lawless and asked her for assistance in increasing her income. In her deposition, Ms. Lawless testified that John was initially reluctant to do so but, after discussing the matter with her, he agreed to establish an irrevocable trust with an initial value of $2,000,000 to provide additional income to Dorothy during her life. His willingness to establish the trust was subject to conditions. One of them was that Dorothy would have to give up her rights to assert additional claims against his assets in the event of his death or their divorce. After further consultation with her clients, Ms. Lawless prepared a marital property agreement and an irrevocable trust agreement for the benefit of Dorothy.

The marital property agreement states in pertinent part:

> This Marital Property Agreement is between Dorothy C. Mergner ("Dottie") and John G. Mergner, Sr. ("John").

---

[6] The Estate asserts that Dorothy was unwilling to care for John but it does not point to any evidence to support this contention.

RECITALS

R1. We were married on September 7, 1996.

R2. John wishes to insure Dottie's financial independence and well being both during his life and following his death, if Dottie survives him.

R3. We each declare that we have fully and adequately acquainted ourselves with the nature and value of the other's assets, and that no formal further disclosures are necessary or desirable.

R4. We intend and agree that (i) each of us shall retain sole ownership, control and enjoyment of our Separate Property free and clear of any claim or right of the other, as if we were not married, (ii) each of us shall be free to dispose of our respective Separate Property during life, or at death, free and clear of any claim or right of the other.

We agree as follows:

1. **Assets.**

1.1. *Dottie's Property*. Dottie has sole right, title, and interest in the assets listed on the attached Schedule, whether titled in her sole name or in the Dorothy C. Mergner Revocable Trust. Dottie retains the right to deal with this property as her Separate Property, including the right to sell or transfer the property, free from any claim by John.

1.2. *Dorothy C. Mergner Irrevocable Trust*. John has agreed to establish the Dorothy C. Mergner Irrevocable Trust, and transfer Two Million Dollars ($2,00,000) [sic] to the Trust. Dottie is the sole beneficiary of this Trust during her life. John understands and acknowledges that this Trust is irrevocable, and that neither he nor his estate retain any rights to the income or assets of the Trust, except as expressly stated in the Trust Agreement.

1.3. *John's Property*. John has sole right, title, and interest in the assets listed on the attached Schedule, whether titled in his sole name or in the John G. Mergner, Sr. Revocable Trust. John retains the right to deal with this property as his Separate Property, including the right to sell or transfer the property, free from any claim by Dottie.

2. **Releases.** Each of us releases all right or interest in the Separate Property of the other that may arise by reason of our marriage. This includes any right or interest that now exists or may be provided for in the future under the laws of Maryland or any other state or territory of the United States. Specifically, but without limitation:

\*    \*    \*

2.2.   *Transfers on Death*. We each release with respect to the other's Separate Property all <u>rights in such property, including but not limited to any distributive share in the estate of the other as a surviving spouse, right to an elective share</u>, community property rights, homestead rights, right to take an intestate share, family allowance, dower, or curtesy. It is our intention that neither of us have any common law or statutory right in or with respect to the Separate Property of the other upon the death of the other by virtue of our marriage. We both acknowledge that this Agreement is a valid waiver of rights pursuant to Maryland Annotated Code, Estates and Trusts Article § 3-205.[7]

\*    \*    \*

3.    **Other Provisions.**

3.1.   *Acknowledgments*. Each of us acknowledges (a) that we have not relied upon the representations of the other during the negotiation of this Agreement except as set forth in this Agreement and attached schedule; (b) that we have read this Agreement and understand its terms and its legal and practical consequences; (c) that the mutual waiver or releases and other terms constitute a fair, reasonable, and adequate resolution of our anticipated rights, obligations, and personal concerns; and (d) that this Agreement is signed freely and voluntarily.

3.2.   *Counsel*. <u>We each acknowledge that (a) we have jointly asked Bonnie J. Lawless to draft this Agreement, pursuant to our joint instructions; and (b) we understand that counsel cannot represent either of us individually in connection with this Agreement. We each waive any conflict of interest counsel may have arising from drafting this Agreement, or on account of</u>

---

[7] Est. & Trusts § 3-205 (2016) stated in pertinent part:

> The right of election of a surviving spouse may be waived before or after marriage by a written contract, agreement, or waiver signed by the party waiving the right of election. *Unless it provides to the contrary, a waiver of "all rights" in the property or estate of a present or prospective spouse*, . . . is a waiver of . . . the waiving party's elective share by each spouse in the property of the spouse[.]

(Emphasis added; cleaned up.)

any attorney client relationship we may have had with her arising from any matter. We each acknowledge that we have the right to seek the opinion and assistance of independent counsel as to the advisability of and terms of this Agreement.

*    *    *

3.7. *Entire Understanding of Parties*. This Agreement contains the entire understanding of us with respect to our interests in the Separate Property and the Joint Property. This Agreement is binding upon, and inures to the benefit of, each of us and our respective heirs and personal representatives.

*    *    *

(Bold and italic formatting in original; underlining added.)

Attached to the marital property agreement was a document titled "SCHEDULE OF ASSETS." It stated in pertinent part:

A.    Definition. "Separate Property" includes, but is not limited to:

1.    All legal and beneficial interests in property (whether real, personal, tangible, or intangible, in trust or otherwise), without regard to the source of funds (including earned income) involved with such acquisition, that is: (i) owned by each of us prior to our marriage; (ii) acquired at any time by gift, bequest, devise, descent, survivorship, or as a beneficiary of a trust; or (iii) acquired during our marriage unless titled jointly with each other with right of survivorship or designated specifically as Marital Property.

2.    All income of any type earned by one of us, regardless of its source, and all money or other property received or to be received by either of us in satisfaction of a judgment for damages for personal injuries, or pursuant to an agreement for the settlement or compromise of a claim for those damages,

3.    With respect to our Separate Property, (i) income or funds of any nature received from or attributable to Separate Property; (ii) the increase in value of Separate Property; and (iii) all property acquired in exchange for or from the proceeds of sale, refinancing or other disposition of Separate Property, or that is directly traceable to such sources.

- 8 -

     B.     <u>Dottie's Assets.</u>

1. The real property located at 10401 Strathmore Court, Apt. 404, Rockville, MD 20852, Property ID No. 04-033 89182.
2. MSSB Account No. \_\_\_\_\_
3. MSSB IRA Account No. \_\_\_\_\_
4. Bank of America Checking Account No. \_\_\_\_\_
5. Tangible personal property located in residence and in storage

     C.     <u>John's Assets.</u>

1. MSSB Account No. \_\_\_\_\_
2. MSSB IRA Account No. \_\_\_\_\_
3. MS Deferred Compensation
4. Bank of America Checking Account No. \_\_\_\_\_
5. Oil and Gas Interests:

(Punctuation, and the absence thereof, in original.)

The Estate asserts that Dorothy signed the marital property agreement on March 22, 2016. In her deposition, Dorothy conceded that her signature appeared on the marital property agreement but asserted that she had no recollection of signing the document.[8] Her signature was notarized by Sarah J. Dale, Esquire, who was a member of Ms. Lawless's law firm. One week later, John signed the marital property agreement and the Dorothy C. Mergner Irrevocable Trust. His signatures were also notarized by Ms. Dale.

The irrevocable trust agreement recited that its assets consisted of "[s]tocks and bonds worth Two Million Dollars[.]" The document designated Dorothy and Ms. Lawless as co-trustees. On April 25, 2016, Dorothy and Ms. Lawless opened a trust account into

---

[8] Ms. Lawless's billing records stated that she met with Dorothy in March 2016 for one and one-half hours to review the marital property agreement. Dorothy testified that she did not recall such a meeting.

which the securities were deposited. In her deposition, Dorothy conceded that her signature appeared on the document opening the trust account. However, she testified that she did not recall signing it.

The Estate asserts that by August 2021, Dorothy had received approximately $450,000 in income from the irrevocable trust account. Dorothy does not contest this.[9]

The additional income generated by the irrevocable trust notwithstanding, Dorothy continued to experience financial difficulties. The record suggests that there were two primary reasons for this. First, at Dorothy's request, John purchased a townhouse for her located in Potomac, Maryland. The townhouse was encumbered by a mortgage, which resulted in a drain on her cash flow. Second, and at about the same time, Dorothy became friends with an individual named Herbert Kershbaumer. She entered into several business arrangements with him, including the purchase of a farm in Virginia. Ms. Lawless was aware of these arrangements, and she became concerned that Kerschbaumer was taking advantage of Dorothy. Peter Randolph, one of Ms. Lawless's law partners, investigated Kerschbaumer's past. As a result, either Mr. Randolph or Ms. Lawless filed a complaint with Montgomery County Adult Protective Services asserting that Kerschbaumer was

---

[9] In her brief, Dorothy asserts that, at some point either before or after the marital property agreement was signed, Thomas Mergner, one of John's children, "took control of managing his father's revocable trust." For factual support, she cites the marital property agreement itself (which does not refer to Thomas Mergner in any fashion) and two passages from her response to the Estate's motion for summary judgment, which make similar assertions without reference to any factual support in the record.

taking advantage of Dorothy.[10] When she learned of this, Dorothy severed her relationship with Ms. Lawless and her law firm.[11]

Shortly thereafter, Dorothy filed the present action. In her complaint, she sought a declaratory judgment that "the purported marital property agreement should be declared to be void." Dorothy asked for no other relief. John filed his answer to Dorothy's initial complaint on February 24, 2021. In the answer, and among other affirmative defenses, John asserted that:

> The Complaint is barred based upon Dorothy Mergner's failure to surrender all the benefits she received from the 2016 estate planning documents.

While the case was pending in circuit court, John passed away and the Estate was substituted in his place on February 22, 2022.

The operative complaint is Dorothy's amended complaint. In it, Dorothy sought a declaratory judgment that the marital property agreement is void or, alternatively, that:

> under the plain language of the agreement, John has . . . no right to deal with any property as his "Separate Property" (because the attached schedule is blank) and [Dorothy] has thus relinquished no rights or interests in any.

---

[10] Dorothy asserts that the complaint was dismissed by the agency. The Estate does not challenge this assertion.

[11] The Estate asserts that, after she discharged Ms. Lawless, Dorothy and Kerschbaumer approached John in an effort to induce him to sign a document revoking the marital property agreement but that John refused to do so. The Estate does not point to anything in the extract or the Estate's appendix that supports these contentions.

Dorothy does not challenge the validity of the irrevocable trust that was established and funded by John in conjunction with the marital property agreement.

After the close of discovery, the Estate filed a motion for summary judgment. Its motion was based on the following factual assertions:

1. In the summer or fall of 2015, Dorothy approached Ms. Lawless to restructure their estate plan so that she could obtain more money from John.

2. John would not agree to provide additional money to Dorothy unless she gave up her spousal estate rights and rights in the event of divorce.

3. In March of 2016, Ms. Lawless drafted, and John and Dorothy executed, the marital property agreement.

4. Pursuant to the terms of the marital property agreement, John agreed to establish the Dorothy C. Mergner Irrevocable Trust and to fund the irrevocable trust with the sum of $2,000,000.

5. Ms. Lawless drafted the irrevocable trust. Its terms were consistent with the pertinent provisions of the marital property agreement. On the same day that John signed the marital property agreement, John executed the irrevocable trust.

6. John transferred $2,000,000 to the irrevocable trust. Dorothy and Ms. Lawless are the Trustees on the irrevocable trust account.

7. Since July 2016, and continuing each month through the present date, Dorothy has received monthly income from the irrevocable trust.

8. Through August of 2021, Dorothy had received the sum of approximately $450,000 from the irrevocable trust.

Filed with the motion were copies of the marital property agreement and the irrevocable trust as well as an affidavit from Ms. Lawless describing the events leading up to the execution of the marital property agreement and the irrevocable trust. In the affidavit, and based on her personal knowledge, Ms. Lawless stated that Dorothy signed the marital property agreement. Additionally, Ms. Lawless averred that "[t]hrough August

of 2021, [Dorothy] has received the sum of approximately $450,000 from the Irrevocable

Trust."[12] Based on these materials, the Estate contended that:

_____

[12] The Estate attached an additional exhibit, namely a letter dated February 3, 2021 to Dorothy's counsel from one of the Estate's lawyers. The letter is captioned "FOR SETTLEMENT PURPOSES ONLY." In the letter, counsel set out their views as to various reasons why Dorothy's claims would not prevail. Among them was the following:

> In addition, since 2016, [Dorothy] has received substantial income from the Irrevocable Trust, totaling at least $411,757. . . . If [Dorothy] pursues her argument that the [marital property agreement] is invalid, [the Estate] will of course demand the return of the principal of the Irrevocable Trust as well as all income received by [Dorothy]. In fact, there is a strong argument that under Maryland law [Dorothy] is required to return those funds before she may pursue her claim.

On appeal, Dorothy asserts that the letter is inadmissible. She cites Md. Rule 5-408, which states in pertinent part:

> Rule 5-408. Compromise and offers to compromise

> (a) The following evidence is not admissible to prove the validity, invalidity, or amount of a civil claim in dispute:

> \* \* \*

> (3) Conduct or statements made in compromise negotiations or mediation.

We will assume that Rule 5-408 barred introduction of the letter as evidence. *See, e.g.*, *Bos. Sci. Corp. v. Mirowski Fam. Ventures, LLC*, 227 Md. App. 177, 201 (2016) (commenting that Rule 5-408 bars the admission of evidence regarding statements made during "mediation and negotiation meetings").

With that said, the transcript of the summary judgment hearing does not indicate that the court relied upon the letter as a basis for its decision. Moreover, it is pellucidly clear that the Estate communicated its position to Dorothy in unmistakable terms on other occasions throughout the course of the litigation. As we have related, in his answer to Dorothy's initial complaint, John asserted that Dorothy's claim failed because she failed "to surrender all the benefits she received from the 2016 estate planning documents." The answer was filed on February 24, 2021. Additionally, the Estate submitted an affidavit by [Ms. Lawless] dated November 17, 2021 in support of its summary judgment motion. In

(Footnote Continued . . . .)

[Dorothy] asserts that even though her [*sic*] and John signed the Marital Property Agreement in March 2016, the Marital Property Agreement is invalid because John lacked the necessary mental capacity. While John (or his representatives) might have been able to challenge the validity of the Marital Property Agreement based on capacity, [Dorothy] cannot.[13]

Additionally, and relevant to the issues raised on appeal, the Estate contended that:

It is black letter law in Maryland, as well as in other jurisdictions, that if a person accepts the benefits of an agreement, they are estopped from questioning the existence, validity, and effect of that agreement. *See e.g. Adamstown Canning & Supply Co. v. Baltimore & O. R. Co*, 137 Md. 199, 112 A. 286 (1920).

\* \* \*

In this case, [Dorothy] wants to have her cake and eat it too. In other words, she wants to retain and continue receiving the benefits of the Marital Property Agreement (through the monthly payments under the Irrevocable Trust), while at the same time agitating the [c]ourt to declare it invalid. By accepting the benefits of the Marital Property Agreement, however, [Dorothy] is barred from challenging the validity or effect of that

_____

that affidavit, [Ms. Lawless] averred that "[t]hrough August of 2021, [Dorothy] has received the sum of approximately $450,000 from the Irrevocable Trust."

We conclude that the Estate's submission of the settlement letter as an exhibit to its motion for summary judgment is not a basis for us to reverse the judgment of the circuit court. We analogize this situation to the well-established principle that an objection to the admissibility of evidence is waived if the evidence is admitted later without an objection. *See DeLeon v. State*, 407 Md. 16, 31 (2008); *Patriot Constr., LLC v. VK Elec. Servs., LLC*, 257 Md. App. 245, 268 (2023).

[13] The Estate cites *Atkinson v. McCulloh*, 149 Md. 662, 674 (1926), for the proposition that "if the sane party knew of the other's insanity, or if the circumstances were such that, as a reasonable and prudent person she should have known of it, the contract may be voided at the option of the lunatic; not the party with knowledge of his disability[.]" We agree with the Estate's reading of *Atkinson*. However, on appeal, Dorothy no longer asserts that she can challenge the validity of the marital property agreement on the ground that John was incompetent when he signed it.

- 14 -

agreement. For that simple reason, John is entitled to the entry of judgment in his favor.

For additional support, and among other authorities, the Estate cited *Honeycutt v. Honeycutt*, 208 N.C. App. 70, 82–84 (2010), and *In re Marriage of Burkle*, 139 Cal. App. 4th 712, 751–54 (2006).

In response, Dorothy asserted that there was a dispute of material fact as to whether she was accepting any benefit under the marital property agreement. Relying principally upon *Taylor v. Mandel*, 402 Md. 109, 135 (2007), she asserted that:

> [w]aiver rests upon the intention of the party, and therefore, acts relied upon as constituting waiver must unequivocally demonstrate that waiver is intended. The right or advantage waived must be known; the general rule is that there can be no waiver unless the person against whom the waiver is claimed had full knowledge of his rights, and of facts which will enable him to take effectual action for the enforcement of such rights.

(Cleaned up.)

Based on this premise, Dorothy argued that there was a dispute of material fact as to whether she was aware that the additional income that she had been receiving as a result of the irrevocable trust derived from the marital property agreement. Dorothy stated that she:

> testified that she did not know that the purported mar[it]al property agreement existed. She did not know that the irrevocable trust existed. She did not know that the periodic income distributions were coming from the irrevocable trust. She did not know that receiving these funds would purport to terminate her statutory rights to her spousal share as John's wife (if he predeceases her). In short, she had no knowledge of the facts relied upon in [the Estate's] motion to [sic] for summary judgment, much less full knowledge of those facts.

The Summary Judgment Hearing

On February 2, 2022, the circuit court held a hearing on the Estate's motion. After listening to arguments from counsel, the court explained its reasons for granting the motion in part:

> THE COURT: All right. Well, it is a complicated matter. It's an unfortunate matter. Hate to see all the estate spent on attorney's fees. But I am going to grant the summary judgment motion. I think [Dorothy] . . . said when did you learn about the [marital] property agreement? When I hired a new attorney, he requested the file from Bonnie Lawless in 2020. That's when it all came to light. I had no idea. So, if anything else, she knew about it in 2020 and continued to receive the benefits of this agreement and, [although] there's not [extensive] Maryland law, that North Carolina case[14] is rather persuasive, though, that you keep receiving the benefits and whether it's that letter to counsel or not but *I think by [Dorothy's] own admission, she knew about this marital settlement agreement, continued to receive the benefits of the trust going on two years now and to this day, she still does*.
>
> How's [Mr. Maccoby[15]] going to argue one document signed on one day is invalid, the other one is proper is beyond an uphill battle for her. That is a really, really tough thing to even say with a straight face and the presumption that the signature and with it notarized and with the statements of the attorney [i.e., Ms. Lawless] that she did sign it and did read it and it's, again, an extremely uphill battle to say I was competent at the time but it should be invalid because the other side was not competent at that time. That is just very hard, I don't see how that could go forward.
>
> *   *   *
>
> And so, *based upon continued acceptance of this benefit from the trust* but not [sic] requesting to invalidate the marital property agreement which flows from it, *I don't see how this matter can go forward*. . . . I don't find a

---

[14] Context indicates that the court was referring to *Honeycutt v. Honeycutt*, 208 N.C. App. 70, 82–84 (2010) . We will discuss *Honeycutt* in our analysis.

[15] Mr. Maccoby is Dorothy's counsel in this litigation.

dispute in fact and whether you call it waiver or however you want to phrase it, she can't, as Mr. Bernstein[16] said, have her cake and eat it, too. And for the other reasons that I've already stated, stated by Mr. Bernstein's pleadings and argument, I will grant the summary judgment motion. Where it goes from here, I will not grant it as to what is the property to the agreement. I think Mr. Maccoby raises a good argument as to that, as to, you can tell by my question I'm not sure, because I see a number of these, you keep yours and I'll keep mine agreement[s]. I've never seen a requirement that it be listed, even in this agreement, so I'll leave that open as to determination if that is still in dispute after the parties talk. Anything else from anyone?

(Emphasis added.)

The court then entered an order that stated in pertinent part:

**ORDERED**, that Defendant's Motion is **GRANTED IN PART**; and it is further

**ORDERED**, that Final Judgment be entered in favor of Defendant John Mergner against Plaintiff on the issue of the validity of the Marital Property Agreement; and it is further

**ORDERED**, that this matter may proceed on the issue of what property is included within the definition of "Separate Property" under the Mar[it]al Property Agreement.

(Formatting in original.)

### The Entry of Final Judgment

As we have related, the circuit court declined to grant summary judgment as to all aspects of the case in order to permit the parties to present evidence that they had an ownership interest in specific assets titled in the name of the other party. A hearing for this purpose was held on April 5, 2022.

---

[16] Mr. Bernstein is the Estate's counsel in this litigation.

- 17 -

The circuit court began by stating that it had reviewed the relevant exhibits and documents, the transcript of the summary judgment hearing, and the order granting partial summary judgment. The court then told Dorothy's counsel, Mr. Maccoby, that it:

> wasn't quite sure from reading the summary judgment motion exactly what the plaintiff [is] seeking to prove today. So, perhaps you could give me a preview, sir.

Mr. Maccoby's response was multi-faceted and at times discursive. We will summarize counsel's contentions in logical sequence as opposed to the order in which they were presented to the court.

Mr. Maccoby asserted that he viewed the ruling of the court in the summary judgment proceeding to be premised upon the notion that the definition of "separate property" in the marital property agreement was ambiguous. He stated that, if the definition is ambiguous, then the evidence that the court should consider pertained to the "subjective intent[s]" of Dorothy and John. Mr. Maccoby continued:

> we have [Dorothy] to testify here today as to what she understood it to be which was that she didn't understand it to be any property, that she had no idea that there was a separate property listed [sic] and that she did not understand she was releasing her spousal elective share [and] this entire case is about is the one third spousal elective share. She did not understand that she was releasing that and based on her testimony we would ask the [c]ourt to make a reasonable inference that had the separate property been listed, actually listed with the values no reasonable person would have signed that least of all her. She is going to testify she would never have released her spousal share if millions of dollars had been listed in that sheet, but the [c]ourt can reasonably infer that because it would have been extreme.
>
> She could have filed for divorce. At that point her husband was in an assisted living home and she could have gotten her money that way.

- 18 -

Anyway so, that is subjective intent from her point of view. That is a preview.

> THE COURT: Well, let me ask you this. . . . Are there any specific items of property, specific items of property that you contend are separate property belonging to [Dorothy]?

This question triggered a series of colloquies between the court and Mr. Maccoby on the one hand, and the court and Mr. Bernstein on the other. Mr. Bernstein asserted that the definition of "separate property" in the marital property agreement was unambiguous and that the Estate was entitled to judgment as a matter of law. Mr. Maccoby asserted that he was unable to respond to the latter contention because of discovery violations on the part of the Estate. Mr. Bernstein stated that there were no discovery violations on the Estate's part and that, even if there were, Dorothy had failed to file a motion to compel discovery. Eventually, the court stated:

> The question [before the court] is whether or not property that [Dorothy is] seeking falls within the definition of separate property for one or the other party. . . . [T]hat means that either side has an opportunity to present to me proof that property that they are seeking an interest in is separate property of one party or the other . . . [T]his is not a question of whether the contract is valid or whether this particular definition is ambiguous. In fact [the definition of "separate property" in the marital property agreement] is pretty specific. The question is what property is included within that definition. If you want to argue that a piece of property whatever it is . . . in that definition I would give you the latitude to prove it. That is what you are here to do.
>
> *     *     *
>
> MR. MACCOBY: . . . [W]e attempted to discover facts as to these accounts, what they were, how many financial account[s] he had. We have discovery requests. We had depositions and none of that was disclosed. They said we are not answering it. . . .
>
> So, we have a plaintiff with a high school education who is a homemaker who had a spousal right until her husband had dementia, a series of strokes,

- 19 -

and was put in an assisted living home, and all of the estate documents changed and all of a sudden she has released her spousal elective share. We looked it [sic], attempted to do discovery, and were completely stymied on any information having to do with any financial accounts. We have no ability to test their evidence, cross-examine them.

Based on this premise, Mr. Maccoby requested "an opportunity to brief the court on the fact that we have no discovery on this[.]" He asserted that, in his deposition, Thomas Mergner[17] declined to answer questions about the value of John's assets. Mr. Maccoby continued:

> We understood that we were going to try the subjective intent regarding what financials were supposed to be listed in February of 2016. Our offer of proof is going to be for the plaintiff. She didn't understand anything was being listed. Nothing was being identified. Their witnesses, John Mergner was virtually incapacitated. He was represented by Tom Mergner who says in his deposition transcript I don't know what was being listed here. . . . [The Estate's] other witness, Bonnie Lawless, [testified that she] intended to describe the financials, but . . . never did for whatever reason . . . .
>
> So, we have no ability to try this because we have no idea what this information is to this day[.]
>
> *     *     *
>
> THE COURT: Let me get a response from the other side.
>
> MR. BERNSTEIN: Thank you, Your Honor. I am a little stunned, a little disappointed by that representation, Your Honor. There has not been even a letter to me saying hey, Brad, we didn't get this discovery. They didn't file any motion to compel. . . . In fact we had filed a motion to compel to produce documents . . . [which] was granted. They then filed a motion to reconsider which was denied. We still didn't get documents from them. We provided them and, Your Honor, I understand that Mr. Maccoby is thrown

---

[17] The material in the record extract and appellee's appendix indicates that Thomas Mergner was John's attorney-in-fact and managed his father's financial affairs after his father entered the assisted living facility.

off by the [c]ourt's decision here this morning, but to argue that on the day of trial that we didn't get discovery when . . . we produced to them the most significant assets are John's accounts at Morgan Stanley. He has got those documents. He has got the Bank of America statements that by the way we had to get you know via subpoena because they are actually going to his client, that he has all of that information.

So, I think Your Honor is correct and I don't think there is any dispute as to how any of these accounts or any of these items identified from either [Dorothy's] assets in the agreement or John's assets in the agreement. If there is a dispute today that is news to me. That has never been an issue[.]

\* \* \*

MR. MACCOBY: May I?

THE COURT: Yes, sir. Of course.

MR. MACCOBY: But if that disclosure statement was listed as a financial account that was one million versus five million versus ten million it matters. A person who looks at that and waives away all --

THE COURT: Well, but wait a minute. No. You are going to a different issue here which is full disclosure, full and fair disclosure. . . . If [the summary judgment court had] found or determined that there was a genuine issue of material fact as to disclosure requirements then you wouldn't have had the summary judgment.

\* \* \*

[E]ither side has an opportunity to present to me proof that property that they are seeking an interest in is separate property of one party or the other . . . . If you want to argue that a piece of property . . . is [within] that definition I would give you the latitude to prove it. That is what you are here to do.

\* \* \*

[W]ith respect to discovery, sir, I understand your frustration with discovery, but we are at trial today and discovery has to be resolved prior to trial by motions to compel or other things. These rules are not self-executing.

Now, here is the situation as I see it and that is that you can go forward as the [c]ourt has outlined its view of the case in terms of proof as to whether something is or is not separate property and whose separate property it is or if you cannot put on any evidence as to that then you can stand mute and the [c]ourt can make a ruling with respect to your prayer for

relief. It is not the defendant's burden at this point. It is your burden to show because your contention is that your client is entitled to certain property that she is being denied.

The operative document is the marital settlement agreement. Therefore, if there is some property that she is being denied that you can prove to me is in fact separate property within the definition of the agreement and there is no adequate defense to that then the [c]ourt would have to grant you the relief you seek. I mean that is the way it works. So, I am going to take a 15-minute break and you can decide what you want to do.

(Recess)

THE COURT: Thank you, everybody. Have a seat please. All right. Counsel, how would you like to proceed?

MR. MACCOBY: Thank you, Your Honor. I would like to make a record and then rest.

THE COURT: Okay.

MR. MACCOBY: Thank you. We first reiterate our motion in limine asking that the [c]ourt bar . . . the defendant from offering any testimony or evidence of what the separate property was in March of 2016 on this agreement and we also ask for an adverse inference that the separate property was zero based on the interrogatory answers 14 through 16 that we listed to the [c]ourt and we will offer marked as Exhibit 1 and based on the power of attorney Tom Mergner's deposition transcript testimony saying that he didn't know then. He wouldn't tell us during the deposition and that he had never actually read the marital property agreement or the schedule of assets and had no knowledge of it. So, based on that we ask for, we make those two oral motions (unintelligible) and motion for limine.

\*     \*     \*

So, we contend we were not required to move to compel anything.

THE COURT: All right. For purposes of the record let me state that I am going to deny the motion in limine on the basis that you have stated. . . . [T]he motion in limine is denied. I don't believe there is any basis upon which to provide the plaintiff with an adverse inference that somehow the separate property was zero and so, that request will also be denied. All right. Plaintiff rests?

MR. MACCOBY: May I make one further --

THE COURT: Absolutely.

MR. MACCOBY: Thank you. Appreciate it. Your Honor, we, our interpretation of the summary judgment order, [the] summary judgment order is that the [c]ourt concluded that the marital property agreement is ambiguous as to what assets if any John retained as a separate property under the agreement. An ambiguity must be decided because the [court] set this for trial for extrinsic evidence as to what is separate property and what isn't. So, we respectfully disagree with the [c]ourt's position that there was not, that [the court] did not find any ambiguity in the marital property agreement.

\*     \*     \*

Next regarding extrinsic evidence we make an offer of proof that the proper inquiry is the subjective for extrinsic evidence and subjective intent of the parties as to what separate property was under that agreement and . . . that in fact the proper standard is the intention of the parties through extrinsic evidence.

\*     \*     \*

Counsel then read into the record a lengthy proffer of the evidence that he would present on Dorothy's behalf if given an opportunity to do so. We have set out the complete proffer in an appendix to this opinion but its substance was that Dorothy had not released her right to claim an elective share of John's estate because the marital property agreement was ambiguous and, in such a circumstance, the parties' subjective intentions control. Additionally, he proffered that (1) Dorothy would prove that John was not competent when he signed the marital property agreement in 2016, (2) Ms. Lawless's simultaneous representation of Dorothy and John constituted an unwaivable conflict "of interest" on her part, and (3) Thomas Mergner was "deeply conflicted" as he stood to gain "millions of dollars if the agreement is interpreted in his favor[.]" After counsel finished his proffer, the court stated:

- 23 -

All right. The [pr]offer is certainly preserved for the record. . . . [A] lot of what counsel has said here goes to issues that were resolved by the ruling of [the court] in granting summary judgment . . . but in fact the issue of what was under the definition [of "separate property"] was raised towards the end of the summary judgment proceeding and so, once again the [court] [concluded] that there may be a factual dispute. It was never an issue as a question of the definition. It is a question of factual dispute and the [c]ourt certainly was willing to afford the plaintiff an opportunity to determine as a factual matter what was the separate property based upon the definition in the agreement. All right. Counsel, you rest?

MR. MACCOBY: Yes, Your Honor.

THE COURT: All right. Mr. Bernstein.

MR. BERNSTEIN: Your Honor, we would ask for a judgment based on no testimony and the offer of proof doesn't provide any evidence as to property that is identified as John's as not being John's. So, we request judgment at this time.

[THE COURT:] All right. The [c]ourt will enter judgment on plaintiff's complaint in favor of the defendant. . . . [I]s the crossclaim still viable?

MR. BERNSTEIN: Your Honor, with the [c]ourt entering judgment on the claim then the crossclaim becomes moot.

\* \* \*

THE COURT: All right. We will find, we will make the judicial determination that any crossclaims by the defendant in this matter are moot. All right. Thank you very much.

On April 5, 2022, the court entered judgment in the Estate's favor as to all of Dorothy's claims.

### THE STANDARD OF REVIEW

Whether a circuit court's grant of summary judgment is proper in a particular case is a question of law, subject to a non-deferential review on appeal. As such, in reviewing a grant of summary judgment, we review independently the record to determine whether the parties generated a dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law. We review the record in the light most

- 24 -

favorable to the non-moving party and construe any reasonable inferences that may be drawn from the well-plead facts against the moving party.

*Tyler v. City of Coll. Park*, 415 Md. 475, 498–99 (2010) (cleaned up).[18]

---

[18] Before beginning our analysis, we will attend to two housekeeping matters.

First, the record extract in this case did not comply with Md. Rule 8-501(c). After oral argument, the panel requested that counsel for the parties supplement the record extract by filing a copy of the circuit court docket entries, as well as a copy of:

> all exhibits attached to the appellee's motion for summary judgment and appellant's response thereto, and appellee's reply in support of the motion for summary judgment, including, but not limited to, all parts of the deposition(s) of Bonnie J. Lawless, Esq. that are in the record.

Counsel provided the Court with a copy of the docket entries as well as the portions of Ms. Lawless's deposition that were properly before the circuit court.

Second, Dorothy asks us to use "[our] express authority under Maryland Rule 5-201(c) and take judicial notice of Ms. Lawless's entire deposition transcript as an adjudicative fact. *See* Md. R. 5-201(c); *see also Dashiell v. Meeks*, 396 Md. 149, 177 (2006)."

The relevant issue in *Dashiell v. Meeks* was whether the Supreme Court of Maryland should exercise its discretion to take judicial notice of documents filed in a separate civil proceeding. 396 Md. at 179. The Court declined to do so, on the basis that the case before it was:

> not of such exceptional circumstances that justice demands that *this Court* exercise its discretionary power and decide this issue based on facts that were not before the [c]ircuit [c]ourt . . . . Were we to go outside the record of the malpractice claim in the name of justice and decide factual matters that could have been before the trial court, we would be circumventing the judicial system and, in so doing, denying the very justice the parties seek.

*Id.* (emphasis in original).

Dorothy certainly had the opportunity to introduce the entirety of Ms. Lawless's deposition into the record of this case at the circuit court level. She failed to do so. That she now regrets her tactical decision is not a basis for us to consider material that was not

(Footnote Continued . . . .)

ANALYSIS

Dorothy presents five issues on appeal which we have consolidated into four.

First, she contends that the circuit court erred in granting partial summary judgment on the basis that she waived her right to challenge the validity of the marital property agreement by retaining the income she had received from the irrevocable trust. She argues that whether she could "accept [the] benefits of a contract and challenge its validity is a question of fact, not properly disposed of on a motion for summary judgment." In support of this proposition, she cites *Clark v. O'Malley*, 434 Md. 171, 182 n.5 (2013), and *Faller v. Faller*, 247 Md. 631, 637 (1967). Relatedly, she asserts that she is not obligated to restore the money received by her pursuant to the marital property agreement because "she would be entitled to that sum regardless of whether the court declares the contract invalid or valid." In support, she cites *Taylor v. Whitehurst*, 151 Md. 621 (1926).

Second, Dorothy argues that "waiver requires both full knowledge of all material facts, plus unequivocal acts demonstrating that waiver is intended, and here there are genuine disputes about both." She cites *Taylor v. Mandel*, 402 Md. at 135; *Wright v. Wagner*, 182 Md. 483, 491 (1943); *St. Paul Fire & Marine Ins. Co. v. Molloy*, 291 Md. 139, 145 (1981); and *Woznicki v. GEICO Gen. Ins. Co.*, 216 Md. App. 712, 726 (2014).

---

presented to the circuit court. Guided by the Supreme Court's admonition in *Dashiell*, we decline Dorothy's request.

Third, Dorothy argues that the circuit court erred in granting partial summary judgment because the court's decision "ignores that, if the court finds for [her], it may rescind the contract and order restitution."

Finally, Dorothy contends that we should reverse the circuit court's entry of a final judgment. She asserts that the circuit court had concluded in the summary judgment hearing that the term "separate property" in the marital property agreement was ambiguous and that the court "[s]ua sponte, . . . reversed the prior decision that the term was ambiguous[.]"

For its part, the Estate argues that Dorothy cannot challenge the validity and the enforceability of the marital property agreement because she "continued (and continues) to accept and receive the monthly distributions from the Irrevocable Trust[.]" In support of this proposition, the Estate cites *Adamstown Canning & Supply Co. v. Baltimore & Ohio R.R. Co.*, 137 Md. 199, 209 (1920); as well as: *Honeycutt*, 208 N.C. App. at 82–84; and *Marriage of Burkle*, 139 Cal. App. 4th at 751–54.

Dorothy does not dispute that she has received regular payments of income from the irrevocable trust established by John, but contends that she was unaware that the payments came from the irrevocable trust. However, she does not deny that the Estate asserted in its answer to her initial complaint that her claim "is barred based upon [her] failure to surrender all the benefits she received from the 2016 estate planning documents." Nor does she deny that she continued to accept the payments after she learned that they were distributions from the irrevocable trust. As we will now explain, these circumstances differentiate the present case from the cases on which Dorothy relies.

- 27 -

## A. Summary Judgment

Dorothy asserts that the circuit court erred in granting summary judgment. She asserts that whether she could accept the monthly payments from the irrevocable trust while at the same time challenging the provisions of the marital property agreement is a factual issue and thus not resolvable in a summary judgment proceeding. She cites *Clark*, 434 Md. at 182 n.5, and *Faller*, 247 Md. at 637, for the proposition that "the question of whether plaintiff may accept the benefits conferred by an agreement [and] then challenge its validity is a factual one, not properly disposed of on a motion for summary judgment." (Cleaned up.) But the citation to *Clark* is of no assistance to Dorothy because the Supreme Court of Maryland was quoting the decision of the circuit court without further comment. 434 Md. at 182 n.5. However, the trial court in *Clark* did cite *Faller*, 247 Md. at 637, and the Court's analysis in *Faller* is certainly relevant to the case before us.

In summary, Olive and Charles Faller entered into a separation agreement in 1961. Under the terms of the agreement, Olive agreed to release all of her dower[19] and other

---

[19] "Dower is a common-law right of a surviving widow to a life estate in one-third of the inheritable real estate owned by the husband during the coverture, which right, prior to the husband's decease, is said to be inchoate, and after his death it becomes consummate." *Silberman v. Jacobs*, 259 Md. 1, 7 (1970) (quoting *Lefteris v. Poole*, 234 Md. 34, 38 (1964)).

Dower rights were abolished by the General Assembly in 1969 as part of the comprehensive recodification of Maryland's testamentary laws that occurred upon the recommendation of the SECOND REPORT OF THE GOVERNOR'S COMMISSION TO REVIEW AND REVISE THE TESTAMENTARY LAW OF MARYLAND (1968). The recodification process has been described in several opinions of the Supreme Court of Maryland and this Court.

(Footnote Continued . . . .)

marital rights in Charles's property in return for, among other things, Charles's agreement to designate Olive as the beneficiary of a life insurance policy on his life in the amount of $60,000. *Faller*, 247 Md. at 633–34. Charles never obtained the insurance policy. When Olive learned of this, she entered into negotiations with Charles to modify their separation agreement. Although settlement discussions extended over a two-year period, the parties were unable to reach an agreement. *Id.* at 635. Eventually Charles died without making any provision for Olive in his will. Olive asserted a claim for a dower interest in all real estate owned by him at the time of his death. *Id*. Litigation ensued and the trial court entered judgment in Charles's estate's favor. Our Supreme Court concluded that Olive's claim failed because, once she learned of Charles's misrepresentation, "it was incumbent upon her to promptly assert her rights." *Id.* at 637. The Court's analysis concluded with the following admonition:

> It is obvious that a party to a contract has no right to abrogate or modify it merely because he finds, in the light of changed conditions, that he made a bad deal. No court should undertake to redraft a contract merely because one of the parties has become dissatisfied with its provisions.

*Id.* at 638 (quoting *Vincent v. Palmer*, 179 Md. 365, 372 (1941)).

The Court's reasoning in *Faller* was applied by this Court in *Saggese v. Saggese*, 15 Md. App. 378 (1972) (holding that a spouse waived her right to rescind a marital separation agreement on the basis of "duress, undue influence, oppression and other

---

*See, e.g.*, *Piper Rudnick LLP v. Hartz*, 386 Md. 201, 222 (2005); *Allen v. Ritter*, 196 Md. App. 617, 626–27 (2010), *aff'd*, 424 Md. 216 (2011).

inequitable conduct" because the spouse waited for approximately two years before challenging the validity of the agreement). The Supreme Court of Maryland reached a similar conclusion in *Adamstown Canning*:

> [W]here one having the right to accept or reject a transaction takes and retains benefits thereunder, he becomes bound by the transaction and cannot avoid its obligation or effect by taking a position inconsistent therewith. Thus it has been repeatedly held that a person by the acceptance of benefits may be estopped from questioning the existence, validity, and effect of the contract.

137 Md. at 209 (quoting 16 Cyc. 787).

Moreover, as the Estate points out in its brief, courts from other jurisdictions have reached the same conclusion in analogous contexts.

For example, in *Honeycutt*, 208 N.C. App. at 72, a spouse attempted to rescind a marital separation agreement based upon the claim of false representations, duress, and other forms of misconduct on the other spouse's part. The Court of Appeals for North Carolina explained that:

> The facts here . . . clearly demonstrate that plaintiff became aware of the claimed unfairness of the Agreement shortly after its execution; this is evidenced by plaintiff's decision to file her first lawsuit for rescission of the Agreement. Although plaintiff argued before the trial court that her first attorney failed to conduct adequate discovery regarding defendant's assets, the fact remains that plaintiff had full knowledge that her acceptance of benefits or the performance occurred pursuant to the agreement. Plaintiff has retained all benefits she has received[.]

*Id.* at 82 (cleaned up).

The court held that the spouse's continued acceptance of payments paid under the terms of the separation agreement for approximately one year after challenging the

validity of the agreement precluded her from challenging the validity of the marital separation agreement. *Id.* at 83–84.

In *Marriage of Burkle*, 139 Cal. App. 4th at 751, the California Court of Appeals concluded that a spouse waived her right to challenge the provisions of a property settlement agreement by "willingly accepting all of the substantial financial benefits to which she was entitled under the Agreement for more than five years[.]"

We conclude that the teachings of our Supreme Court in *Faller* and *Adamstown Canning*, together with the reasoning of this Court in *Saggese*, and the thorough and well-reasoned analyses by the *Honeycutt* and *Burkle* courts, point to the conclusion that Dorothy waived her right to challenge the validity of the marital property agreement by accepting the benefits of that agreement after she was indisputably placed on notice that her claim against the Estate was "barred based upon [her] failure to surrender all the benefits she received from the 2016 estate planning documents." This occurred at the very latest when John filed his answer to Dorothy's initial complaint on February 24, 2021.

To avoid this result, Dorothy relies on *Taylor v. Whitehurst*, 151 Md. at 631–32. She asserts that the relevant teaching of *Taylor* is that she is not obligated to restore the money received by her pursuant to the marital property agreement because "she would be entitled to that sum regardless of whether the court declares the contract invalid or valid." We do not agree with Dorothy's reading of that decision.

The facts of *Taylor* were convoluted and unusual. The case arose out of the administration of the estate of Charles Whitehurst, who died intestate in Baltimore in

1924. His surviving siblings and his mother, Anna Whitehurst Taylor, were appointed as the personal representatives of his estate. They represented to the orphans' court that Charles was unmarried. The net value of Charles's estate was $271,716.48. *Id.* at 628.

After the estate was opened, a woman calling herself Claire Whitehurst filed a petition in the orphan's court asserting that she was Charles's spouse. *Id.* at 623. As his surviving spouse, she was entitled to receive one-half of his net estate, which was $135,858.24. *Id.* at 628.

After she filed her petition, Claire was approached by an individual identified in the opinion by the pseudonym "Brown," who represented to her that he was a lawyer. "Brown" advised her to settle her claim, for the following reasons:

> that all of her witnesses had been bought by the Whitehursts[;] that the Ku Klux Klan would get her if she did not accept the offer made by the said Whitehursts; that the Whitehursts had procured to be issued in the city of Baltimore, a warrant for her arrest; and that she would be arrested if she entered the State of Maryland . . . [and that] her attorneys in Maryland were going to desert her[.]

*Id.* at 624–25 (cleaned up).[20]

Acting on this advice, Claire signed a document that the Supreme Court described as being in "the nature of a quit claim deed[,]" assigning her claim to Anna Whitehurst Taylor for $11,000. Taylor was the sole distributee of the estate. *Id.* at 625, 628.

---

[20] Claire also alleged that there were two other individuals (referred to by the pseudonyms "Jones" and "Smith") who also made false representations to her to induce her to settle her claim against Charles's estate. *Taylor*, 151 Md. at 623–28. But "Brown" appears to have been the principal malefactor.

Shortly after the assets of the estate were distributed to Taylor, Claire filed suit against her. Claire alleged that the representations made to her by "Brown" were false and that he was not acting on her behalf but was part of a conspiracy orchestrated by Taylor and another of Charles's surviving siblings who was also a co-personal representative of Charles's estate. *Id.* at 627–28. Taylor filed a demurrer to the bill of complaint. Among other things, she asserted that Claire's claim failed as a matter of law because there was no allegation in the complaint that Claire "returned or offered to return the money paid to her as a consideration for the execution by her of the instrument of writing mentioned in the bill." *Id.* at 631. The trial court overruled the demurrer. In affirming the court's judgment, the Supreme Court of Maryland stated in relevant part:

> [Taylor] . . . invokes the equitable doctrine of restitution, which makes it a condition precedent to the right of rescinding a contract that the party against whom relief is sought shall be restored substantially to the position he occupied before the transaction complained of. *Bigelow on Fraud*, vol. 1, p. 420. And in an attempt to apply this doctrine to the case before us, she claims that [Claire] should have alleged in the bill that she returned, or offered to return, to the appellant the amount received by her in consideration of her signing and executing the instrument of writing by which she released or assigned all her interest and rights in the estate of her alleged husband, Charles E. Whitehurst, deceased.
>
> To this doctrine or rule, there is a well recognized exception, which is, "that one who attempts to rescind a transaction on the ground of fraud, mistake, or otherwise, is not bound to restore that which he has received by virtue thereof, *when, in any event, he is entitled to retain it as indisputably his own, no matter what may be the fate of his effort to rescind the transaction.*" *Williston on Contracts*, sec. 1530.

*Id.* at 631–32 (emphasis added).[21]

Dorothy argues that the Supreme Court's reasoning in *Taylor* means that her receipt

of the monthly distributions from the irrevocable trust is irrelevant. She states:

> No matter the outcome of this case, it is undisputed that [she] is entitled
> to retain at least the amount of the benefit she received from the trust
> ($450,000). First, if the agreement is upheld, it is undisputed that she will
> be entitled to keep this amount. Alternatively, if it is set aside, the amount
> she will receive as an elective share will be at least double this amount—
> and likely 10 times that amount.

> Before John became incapacitated, *his revocable trust had assets totaling
> $15 million*. Because John has surviving offspring, [Dorothy's] elective
> share would be one-third of the estate. *See* Md. Code Ann., Est. & Trusts
> § 3-403(1). Thus, her elective share would be $5 million— more than 10
> times what she received from the trust—if this is the value of John's estate.

> After John's health began declining, however, Tom took control of
> managing John's estate. And its assets began vanishing. *Today, Tom
> contends, it has assets of just $3 million*. [Dorothy] believes, with good
> reason, that Tom wrongfully conveyed the missing $12 million to himself.
> Yet even if he did not, the amount of [Dorothy's] elective share would be at
> least $1 million—more than double the amount she allegedly received from
> the trust.

(Cleaned up; emphasis added.)

In our view, there are two fatal difficulties with Dorothy's argument. The first is that

she points to no evidence in the record to support her assertions that John's assets totaled

---

[21] The Supreme Court affirmed the trial court's judgment. *Taylor*, 151 Md. at 638.
Pursuant to the Court's mandate in *Taylor*, the case was remanded to the circuit court for
trial. In the interim, Taylor passed away and the remaining personal representatives were
substituted as defendants. *Whitehurst v. Whitehurst*, 156 Md. 610, 611 (1929). The trial
court entered judgment on the former personal representative's behalf. That judgment
was reversed by the Supreme Court based upon its independent review of the record. *Id.*
at 625.

$15 million when he became incapacitated and $3 million at the time that she filed her brief. To be sure, her counsel has made such claims but counsel's assertions are not evidence.[22]

Second, *Taylor v. Whitehurst* is distinguishable from the case before us in one critical respect. Claire received $11,000 in return for assigning her claim to Taylor. Her distributive share of her late husband's estate was $135,858.24. If she prevailed on the merits, she would have retained the $11,000 already paid to her and would have been awarded damages of $124,858.24. If she lost on the merits, she would have been entitled to retain the $11,000 paid to her. Thus, it was indisputable that Claire would retain the $11,000 received by her regardless of the outcome of her claim against Taylor.

The case before us is very different. In *Taylor*, the exact amount that Claire would have received if she prevailed was not in dispute. In the case before us, the amount of money received by Dorothy from the irrevocable trust was not fixed but increased with each monthly distribution. Additionally, in contrast to *Taylor*, there is no evidence as to

_____

[22] As support for her contention that Dorothy should not be required to cease accepting payments from the irrevocable trust, her counsel asserts the following: "[w]ith John's health in decline, Tom Mergner took control of managing his father's revocable trust." As support, he cites to the marital property agreement. That document provides no support for counsel's assertion. Counsel also asserted that "[m]illions of dollars soon disappeared" from John's trusts and that "[b]y 2015, for example, $5 million had vanished." As support, counsel cites to statements in Dorothy's response to the Estate's motion for summary judgment which in turn contained no references to any facts in the record. Dorothy points to no evidence in the record that supports her appellate contentions on the waiver issue.

what Dorothy's recovery might be if she prevailed in this action. *Taylor* provides no support for Dorothy's contentions in this appeal.

Dorothy cites *Taylor v. Mandel*, 402 Md. at 135; *Wright*, 182 Md. at 491; *Progressive Cas. Ins. Co. v. Ehrhardt*, 69 Md. App. 431, 438 (1986); *St. Paul Fire*, 291 Md. at 145; and *Woznicki*, 216 Md. App. at 726, for the proposition that "waiver requires both full knowledge of all material facts and unequivocal acts demonstrating that waiver is intended." (Citing *Taylor v. Mandel*, 402 Md. at 135–36.) She contends, in the current case, that:

> Genuine issues of material fact exist about whether [Dorothy] knew that she was accepting any benefits under the purported marital property agreement. Among other things, [Dorothy] testified that she did not know that the purported mar[it]al property agreement existed.

The references to the extract cited by Dorothy to support these contentions are (1) her testimony that she was unaware of the existence of the marital property agreement until she discharged Ms. Lawless as her counsel and that, prior to that she "had no idea that [the] document existed"; (2) her testimony that she had never spoken to Ms. Lawless about the marital property agreement; (3) Ms. Lawless's billing records and notes, which Dorothy incorrectly asserts "confirm that [Dorothy's] suspicion was correct." (In fact, Ms. Lawless's billing records indicate that she met with Dorothy for 1.5 hours on March 2, 2016 to review and discuss the marital property agreement and the irrevocable trust.)

Dorothy's contentions are not persuasive. The irrevocable trust was established and funded by John to fulfill one of the provisions of the marital property agreement. In our view, the dispositive material facts are that Dorothy continued to receive the income

generated by the trust while challenging the validity of the marital property agreement itself. In this regard, she is no different from the losing parties in *Faller*, *Saggese*, *Adamstown Canning*, *Honeycutt*, and *Marriage of Burkle*. Moreover, Dorothy was indisputably placed on notice that her claim that the marital property agreement was unenforceable was "barred based upon [her] failure to surrender all the benefits she received from the 2016 estate planning documents." This occurred when John filed his answer to Dorothy's initial complaint on February 24, 2021. Thus, Dorothy had "full knowledge of all [the] material facts," and her decision to continue to accept the income generated by the irrevocable trust was an unequivocal act "demonstrat[ing] that waiver [was] intended." *Taylor v. Mandel*, 402 Md. at 135–36.

We conclude that the circuit court did not err when it granted in part the Estate's motion for summary judgment.[23]

## B. The "Separate Property" Issue

As we have related, the circuit court declined to grant summary judgment as to all aspects of the case in order to permit the parties to present evidence as to "what property is included within the definition of 'Separate Property' under the Mar[it]al Property Agreement."

---

[23] In her brief, and citing *Benjamin v. Erk*, 138 Md. App. 459, 471 (2001), Dorothy asserts that the circuit court has the authority to "restore parties to their pre-contractual position by ordering restitution in appropriate cases." But this is not an appropriate case for the court to exercise such authority because Dorothy's contentions fail on their merits.

At the subsequent hearing, Dorothy did not contend that there was property titled in John's name that was actually owned by her. Instead, she argued that the court's earlier decision to grant partial summary judgment was based on the unarticulated premise that the marital property agreement was ambiguous. Based on this assumption, her counsel proffered that:

> we can meet our burden by a preponderance of the evidence that John did not retain any specific assets as a separate property and [Dorothy] . . . has not released any right to any elective share of those assets. The offer of proof is that there were only two parties to the marital property agreement, John and [Dorothy]. *Their subjective intent, proof of their subjective intent is determinative of this issue.* [Dorothy] will testify that she did not have any subjective intent for John to retain any specific assets as a separate property under the agreement or to release any elective share in those assets.

(Emphasis added.)

We will assume for purposes of analysis that the definition of separate property in the marital property agreement is ambiguous. Nonetheless, we conclude that Dorothy's contention that the marital property agreement should be interpreted according to her subjective understanding of its meaning is not consistent with Maryland law.

In *Impac Mortgage Holdings, Inc. v. Timm*, 474 Md. 495, 507–08 (2021), the Court explained:

> If a contract provision is ambiguous, the narrow bounds of the objective approach [to the interpretation of contracts] give way, and the court may consider extrinsic evidence to ascertain the mutual intent of the parties. In that effort, the court is to consider admissible evidence that illuminates the intentions of the parties at the time the contract was formed. When addressing an ambiguous provision in a contract, the court will search to find mutuality and not a self-serving, unilateral construction of the contract.

- 38 -

To be admissible, extrinsic evidence of intent as to the meaning of a contract term must demonstrate an intent made manifest, not a secret intent at the time of contract formation. The parties' construction of the contract before the controversy arises can be an important aid, as can be the usage of the term in the parties' trade. And, communications between the parties about a contract subsequent to the execution of that contract may be admissible as evidence of an interpretation by both parties. *However, retrospective, subjective, and unexpressed views about the contract are not proper extrinsic evidence*: *It is the intention of the parties as expressed in their words and the paper which they sign, not their own interpretation as to what their statements and acts were supposed to mean, which is determinative.*

(Cleaned up; emphasis added.)

Applying *Impac Mortgage*'s analytical rubric to the facts of the present case points to the following conclusions:

There is nothing in the record of the present case that suggests that Dorothy and John had communications with one another about the meaning of the marital property agreement either before or after it was executed. In her deposition, Dorothy testified that she had no recollection of signing the agreement nor any recollection of discussing the agreement with Ms. Lawless. Dorothy also testified that she never saw the marital property agreement until after she discharged Ms. Lawless as her attorney. The substance of her counsel's proffer at the second hearing was that, if given an opportunity to do so, she "will testify that she did not have any subjective intent for John to retain any specific assets as a separate property under the agreement or to release any elective share in those assets." This is just the sort of "retrospective, subjective, and unexpressed views about the contract [that] are not proper extrinsic evidence[.]" *Impac Mortg.*, 474 Md. at 508.

Moreover, Dorothy's proffered testimony would not provide insight into any intent on her part that was "made manifest" prior to the execution of the marital property agreement. *Id.* (cleaned up). Instead, her proffered testimony would be inadmissible because it described her "secret intent at the time of [the] contract formation[,]" in order to prove her "self-serving, unilateral construction of the contract." *Id.* (cleaned up).

In granting the motion for summary judgment, the court left open the possibility that Dorothy would assert that property titled in John's name as of the date that the marital property agreement was in fact owned by Dorothy. Dorothy had an opportunity to present such evidence and she declined to do so. Instead, she contended that, if given an opportunity to do so, she could present evidence that would demonstrate that there was a genuine dispute of material fact as to whether the marital property agreement was an enforceable contract. But her proffered evidence consisted entirely of her subjective interpretation of the marital property agreement. As we have explained, the Court's analysis in *Impac Mortgage* leads us to conclude such evidence would not be admissible.

The court did not err when it entered judgment in favor of the Estate.

> **THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IS AFFIRMED. APPELLANT TO PAY COSTS.**

MR. MACCOBY: Next we make an offer of proof that we can meet our burden by a preponderance of the evidence that John did not retain any specific assets as a separate property and Dottie, Dorothy Mergner, Dottie has not released any right to any elective share of those assets. The offer of proof is that there were only two parties to the marital property agreement, John and Dottie. Their subjective intent, proof of their subjective intent is determinative of this issue. Dottie will testify that she did not have any subjective intent for John to retain any specific assets as a separate property under the agreement or to release any elective share in those assets. She would testify that she did not know what John's total assets were nor what they were specifically. She did not know what their total value was nor their individual values. She did not know what an elective share was.

Next we would offer proof that or the [c]ourt would hear that John did not testify. We are sorry, but he has passed. He was not deposed in this case. Indeed he did not even know this case existed. He was mentally incompetent at the time the case was filed. His son Tom Mergner presided over the case until he passed away after which his attorney Bonnie Lawless took over as power of attorney. Thus the only direct evidence from the parties themselves of their subjective intent is that of the plaintiff.

Next and I only just need a couple more minutes. Next --

THE COURT: Take as much time as you need, sir.

MR. MACCOBY: Thank you. Next the, we would as an offer of proof we would anticipate that the defendant would rely on evidence from others, but those, Tom Mergner and Bonnie Lawless with those witnesses have admitted either they know nothing, in discovery they said they knew nothing, or they are hopelessly conflicted or both. Tom Mergner has no direct evidence of the parties' subjective intent. He testified that he never had any conversation with anyone about the marital property agreement before it was entered into. He testified that he never had any conversation with anyone about the marital property agreement's contents until he was deposed in this case in July of 2021, more than five years after the marital property agreement was entered into and which makes any testimony of his hopelessly remote in that the key inquiry is the intentions of the party at the time of the execution of the contract and Tom Mergner is deeply conflicted. He stands to gain millions of dollars if the agreement is interpreted in his favor and Dottie is cut out of her elective share of John's estate.

The other witness they would offer Bonnie Lawless is likewise hopelessly conflicted. She drafted the agreement purportedly under a joint representation of John and Dottie. She admits that only John paid her and never Dottie. She admits that she forgot to complete the schedule of John's assets in schedule C of the agreement. She admits she has no contemporaneous written evidence of Dottie's or John's subjective intent. She claims that her computer crashed wiping out all her e-mails and electronically stored records from during the relevant time period. Anything before 2017 everything is wiped out. We had no records from her whatsoever except handwritten records or printed records, no e-mails. So, we had no idea what she was communicating with Tom Mergner. She also personally represents Tom Mergner. . . .

THE COURT: Counsel, I think we are going into argument as opposed to [an] offer of proof. So, why don't you continue with what you believe the proof would show?

MR. MACCOBY: Yes, Your Honor. She represents Tom Mergner. She is still counsel to Tom Mergner. She has done his estate planning. Again he stands to gain millions of dollars. His agreement is interpreted in his favor and Dottie is cut out of the estate and finally she is now representing John's estate against Dottie in this case, the case about the same subject of her joint representation of John and Dottie which is a clear unwaivable conflict and she is doing so without requesting or receiving a conflict from Dottie. So, both witnesses that they offer would have offered circumstantial evidence of John's intent. John at the time we would offer proof that at the time he was, had dementia. The [c]ourt say [sic] that was part of the record earlier in the case and we had an expert witness on that subject. Based on that that is the offer of proof we would offer under a subjective intent test that we contend is the appropriate inquiry, factual inquiry for the [c]ourt today. Thank you.